## DUEL *v.* HOLLINS.

## WIENER, LEVY & CO. *v.* HOLLINS.

### APPEALS FROM THE CIRCUIT COURT OF APPEALS FOR THE SECOND CIRCUIT.

Nos. 352, 353. Argued May 4, 5, 1916.—Decided June 5, 1916.

A bankrupt firm of brokers having, prior to bankruptcy carried on marginal transactions for several different customers in shares of stock of the same corporation amounting in the aggregate to more than the number of shares of that stock in their possession at the time of the bankruptcy, and none of such shares being identified as the particular shares carried for any of the respective customers, but all of whom demanded their full quota of shares and offered to pay the amount due thereon, *held* that:

Brokers and their customers stand in the relation of pledgee and pledgor.

In dealings between brokers and customers stock certificates issued by the same corporation lack individuality; they are, like receipts for coin, to be treated as indistinguishable tokens of actual values.

As between themselves, after paying the amount due the broker on a marginal transaction, the customer has a right to demand from the broker delivery of stock purchased for his account and such a delivery may be made during insolvency without creating a preference.

The fact that the bankrupt broker in this case did not have sufficient shares of stock of a corporation on hand at the time of his

bankruptcy to satisfy the demands of all of his customers entitled to shares of that particular stock *held* not to prevent such customers from obtaining any of such shares, and require that all of such shares go into the general estate, but *held* that all of such customers were entitled to such shares and on demanding the same and paying the amounts respectively due thereon, should participate *pro rata* in a division of the shares actually on hand.

219 Fed. Rep. 544, reversed and 212 Fed. Rep. 317, affirmed.

THE facts, which involve the relative rights of the trustee in bankruptcy of a firm of brokers and various customers entitled to shares of stocks carried on margin by such brokers, are stated in the opinion.

*Mr. Frederick W. Longfellow,* with whom *Mr. Lewis L. Delafield* was on the brief, for appellant in No. 352.

*Mr. Stuart McNamara,* with whom *Mr. Carl A. de Gersdorff* was on the brief, for appellants in No. 353.

*Mr. William C. Armstrong,* with whom *Mr. Charles K. Beekman* was on the brief, for appellees.

MR. JUSTICE MCREYNOLDS delivered the opinion of the court.

Hollins & Company, brokers and members of the New York Stock Exchange, went into bankruptcy November 13, 1913.

On October 13, 1912, they purchased for appellant Duel a hundred shares of Amalgamated Copper Company stock—"Copper"—and received certificates therefor which they subsequently disposed of by deliveries on account of sales for customers.

October 25, 1912, they purchased for one Bamberger thirty shares of "Copper," received a certificate therefor and pledged this for their own benefit with the National Bank of Commerce.

February 25, 1913, they purchased for appellants Wiener, Levy & Company fifty shares of "Copper" and received a certificate. About June 13, 1913, this passed out of their control "for and in behalf of another customer."

Prior to November 1, 1913, they were directed to purchase for one Landau a hundred shares of "Copper," and their books charge them as carrying this number for his account.

At the close of business November 7, 1913, they were responsible to customers for two hundred and eighty shares of "Copper"—Bamberger thirty, Duel one hundred, Wiener, Levy & Company fifty, Landau one hundred; and they held in actual possession—"in the box"— only two certificates for fifty shares each. November 10, 1913, they used these in making delivery on a short sale. On the same day that sale was "covered" and on November 11 they received and placed in their box a certificate (No. 29373) for one hundred shares.

When bankruptcy occurred (November 13) their entire liability to "long" customers on account of "Copper" arose from purchases of two hundred and eighty shares as above narrated; and they actually held only certificate No. 29373, received two days before. To secure their own loans they had on pledge with Kings County Trust Company and National Bank of Commerce, respectively, certificates for fifty and thirty shares; and they also had an outstanding short sale of one hundred shares.

In the deposition of Allaire, bankrupts' cashier, it is said:

"The said certificate No. 29373 was never marked or otherwise identified by Hollins & Co. as the property of any particular person or customer, or placed in any envelope bearing any indication that the said stock was held for the special account of any particular customer or

person, and no memorandum appears upon the books or records of Hollins & Co. to the effect that said stock was purchased or held for the special or particular account of any one customer or person.

. . .

"It was the practice of Hollins & Co. to use certificates of stock on hand in making deliveries thereof, indiscriminately and without regard to particular certificates or certificate numbers, excepting only cases where customers deposited certificates of stock standing in their own names as margin for their own accounts, where such certificates were usually retained in kind, but at no time from the 1st day of November, 1913, until and including the 13th day of November, 1913, were there any certificates for Amalgamated Copper stock standing in the name of any customers.

"Certificate No. 29373 representing 100 shares of Amalgamated Copper stock was not purchased or received for the account of any member of the firm of Hollins & Co., or for the personal account of said firm as a whole, but was received from the Stock Exchange Clearing House in the usual course of business as representing the balance of Amalgamated Copper stock due said firm on balance on said date."

The record indicates that all transactions in question were made in pursuance of the usual contracts for speculative purchases and sales of stock upon margins.

By timely petitions appellants claimed that in adjusting their accounts for final settlement with bankrupts' estate they were entitled to have allotted to them respectively 100/280 and 50/280 of the one hundred shares of "Copper" represented by certificate No. 29373. The District Court, Southern District of New York (212 Fed. Rep. 317), sustained their position and ordered accordingly, but the Circuit Court of Appeals reached a different conclusion and reversed the order. 219 Fed. Rep. 544.

The facts of the present case differ in some respects from those presented in *Gorman* v. *Littlefield*, 229 U. S. 19; but we think a logical application of principles there approved requires disagreement with the Circuit Court of Appeals and approval of order in the District Court.

In view of our former opinions it must be taken as settled: That bankrupts and their customer stood in the relation of pledgee and pledgor. That in their dealings stock certificates issued by same corporation lacked individuality and, like fac-simile storage receipts for gold coin, could properly be treated as indistinguishable tokens of identical values. That as between themselves, after paying amount due brokers, the customer had a right to demand delivery of stocks purchased for his account; and such delivery might have been made during insolvency without creating a preference. *Richardson* v. *Shaw*, 209 U. S. 365; *Thomas* v. *Taggart*, 209 U. S. 385; *Sexton* v. *Kessler*, 225 U. S. 90; *Gorman* v. *Littlefield*, 229 U. S. 19.

Summing up the doctrine of *Richardson* v. *Shaw* concerning legal relationship between customer and broker in buying and holding shares, we said in *Gorman* v. *Littlefield* (pp. 23–24): "It was held that the certificates of stock were not the property itself, but merely the evidence of it, and that a certificate for the same number of shares represented precisely the same kind and value of property as another certificate for a like number of shares in the same corporation; that the return of a different certificate or the substitution of one certificate for another made no material change in the property right of the customer; that such shares were unlike distinct articles of personal property, differing in kind or value, as a horse, wagon or harness, and that stock has no earmark which distinguishes one share from another, but is like grain of a uniform quality in an elevator, one bushel being of the same kind and value as another. It was therefore

concluded that the turning over of the certificates for
the shares of stock belonging to the customer and held by
the broker for him did not amount to a preferential trans-
fer of the bankrupt's property."

And we there further declared (pp. 24–25): "It is there-
fore unnecessary for a customer, where shares of stock
of the same kind are in the hands of a broker, being held
to satisfy his claims, to be able to put his finger upon the
identical certificates of stock purchased for him. It is
enough that the broker has shares of the same kind which
are legally subject to the demand of the customer. And
in this respect the trustee in bankruptcy is in the same
position as the broker. *Richardson* v. *Shaw, supra.* It
is said, however, that the shares in this particular case
are not so identified as to come within the rule. But it
does appear that at the time of bankruptcy certificates
were found in the bankrupt's possession in an amount
greater than those which should have been on hand for
this customer, and the significant fact is shown that no
other customer claimed any right in those shares of stock.
It was, as we have seen, the duty of the broker, if he sold
the shares specifically purchased for the appellant, to
buy others of like kind and to keep on hand subject to
the order of the customer certificates sufficient for the
legitimate demands upon him. If he did this, the identi-
fication of particular certificates is unimportant. Further-
more, it was the right and duty of the broker, if he sold
the certificates, to use his own funds to keep the amount
good, and this he could do without depleting his estate
to the detriment of other creditors who had no property
rights in the certificates held for particular customers.
No creditor could justly demand that the estate be aug-
mented by a wrongful conversion of the property of
another in this manner or the application to the general
estate of property which never rightfully belonged to the
bankrupt."

When the bankruptcy which occasioned *Gorman* v. *Littlefield* took place the broker's box contained certificates, not specifically allotted, for three hundred and fifty shares of the designated stock and the appellant's claim for two hundred and fifty was the only one presented by a customer. We held that under the circumstances no more definite identification was essential, and approved his contention. If in the instant cause a certificate for two hundred and eighty shares of "Copper" instead of one hundred had been on hand the four customers for whom that number were purchased might successfully claim them under rule approved in Gorman's case. And merely because the one actually in the box represented insufficient shares fully to satisfy all is not enough to prevent application of that rule so far as the circumstances will permit. The District Court properly awarded to appellants their *pro rata* parts of the one hundred shares.

*Decree of Circuit Court of Appeals reversed, and decree of District Court affirmed.*

MR. JUSTICE PITNEY, with whom concurred MR. JUSTICE HUGHES, dissenting:

In *Gorman* v. *Littlefield*, 229 U. S. 19, the reasoning embodied in the following extract from the opinion (p. 24) was, as I take it, essential to vindicate the conclusion reached by the court: "It is said, however, that the shares in this particular case are not so identified as to come within the rule. But it does appear that at the time of bankruptcy certificates were found in the bankrupt's possession in an amount greater than those which should have been on hand for this customer, and the significant fact is shown that no other customer claimed any right in those shares of stock. It was, as we have seen, the duty of the broker, if he sold the shares specifically pur-

chased for the appellant, to buy others of like kind and keep on hand subject to the order of the customer certificates sufficient for the legitimate demands upon him. If he did this, the identification of particular certificates is unimportant."

In the present case, it does not appear that at the time of the inception of the bankruptcy proceedings certificates were found in the brokers' possession equal in amount to those which should have been on hand; several customers are laying claim to the shares that were on hand; and it affirmatively appears that the brokers, having sold the shares specifically purchased for these customers, had not bought others of like kind, nor kept on hand certificates sufficient for the claims of the customers upon them. Not only was no stock kept on hand· to answer the claims aggregating 280 shares, but it affirmatively appears that the 100 shares that were on hand were not acquired with intent to make restitution. The deposition of Allaire, the only man having knowledge upon the subject, was that Certificate No. 29,373, representing 100 shares of Amalgamated Copper Stock, "was received from the Stock Exchange Clearing House in the usual course of business as representing the balance of Amalgamated Copper Stock due said firm on balance on said· date"—the date being one unconnected with any transaction for account of the appellants or either of them.

It is one thing to infer an intent to make restitution to a customer when the acts have been done that are necessary to effect restitution; it is an entirely different matter to infer an intent to make restitution when no restitution has in fact been made. The presumption of an intent to restore fractional interests in this case must rest on the merest fiction; and such a fiction ought not to be indulged in cases of this character, where it will inevitably result in creating a series of arbitrary

preferences, contrary to the .equity of the Bankruptcy Act.

I think the decree of the Circuit Court of Appeals (219 Fed. Rep. 544) ought to be affirmed, and am authorized to say that MR. JUSTICE HUGHES concurs in this dissent.