## PIRKEY v. WILLIAMS.

---

Equity; Stocks and Stockbrokers; Bona Fide Purchasers; Principal and Agent.

1. A customer having a marginal account with stockbrokers, in order to secure the release of certain of his securities, deposited with them other securities and afterwards made a cash payment on his loan. The market value of such other securities and the cash paid more than equaled the market value of the securities to be released. Between the date of such deposit and the date of the cash payment, the brokers received from another customer, with an order to sell and reinvest the proceeds, securities of the same kind as those to be released to the first customer, the certificates being indorsed in blank; and on receiving the cash payment from the latter customer delivered to him the securities so obtained from the second customer. Shortly afterwards the brokers were adjudged bankrupts. In a suit by the second customer to recover his securities from the first customer, it was *held* that the first customer was a bona fide purchaser for value of the securities, and entitled to them as against the second customer.

2. Where a bank lends money to a customer, and, in carrying out his instructions, uses the proceeds of the loan to take up securities

which the customer has on deposit with stockbrokers to secure a marginal account, the agency of the bank is limited to receiving the securities and making the payment to the brokers; and knowledge by the bank of the insolvency of the brokers is not imputable to the customer.

No. 2940.   Submitted December 6, 1916.   Decided January 2, 1917.

HEARING on an appeal by the plaintiff from a decree of the Supreme Court of the District of Columbia, dismissing a bill in equity for the recovery of certain shares of stock.

<em>Affirmed.</em>

The COURT in the opinion stated the facts as follows:    ,

This appeal is from a decree in the supreme court of the District dismissing appellant's bill seeking to have appellees deliver to him ten shares of the capital stock of the Southern Pacific Company, upon the ground that the appellee J. Chauncey Williams, who had received the stock from Lewis Johnson & Company, to whom appellant Omar F. Pirkey, had intrusted it to sell, was not a bona fide holder for value.

In 1912, Mr. Williams opened an account with the firm of Lewis Johnson & Company, stockbrokers, and thereafter maintained a marginal account with them.   On August 31, 1914, the firm was carrying for Mr. Williams fifty shares of the common stock of the American Can Company, twenty-five shares of the common stock of the United States Steel Corporation, fifty shares of the capital stock of the Southern Pacific Company, one Dupont 4½s bond, and one South Carolina Light, Power, & Railways bond.   The total value of these securities was about $8,000, upon which Mr. Williams had advanced about $2,400, or a 30 per cent margin..   Mr. Williams concluded to take up the fifty shares of Southern Pacific stock, and suggested that he be permitted to do so by the payment of $2,425.   Thereupon, on September 4th, Lewis Johnson & Company, in a letter to him, directed attention to the fact that if he paid no more than the $2,425 and took up $4,200 worth of securities, it

would leave his remaining securities protected by a margin of less than 10 per cent. On September 8th Mr. Williams, who lived in Virginia, came to the city and had an interview with Lewis Johnson & Company, in which it was agreed that Mr. Williams should deliver twenty shares of Northern Pacific stock, the value of which was about par, and pay $2,425 in cash, "in order to get out the fifty Southern Pacific." The firm not being ready to deliver the Southern Pacific stock, Mr. Williams left the twenty shares of Northern Pacific, indorsed in blank, and advised the firm that when it was ready to make delivery it might do so to the appellee, the American Security & Trust Company, and receive a check for the balance, he, Williams, having arranged for a loan from the latter company. Mr. Williams' reason for taking up the Southern Pacific stock was that he wished to hold that stock as an investment, and he preferred to leave it with bankers rather than brokers. Moreover, the brokers were charging him 6 per cent for carrying his securities, while he could obtain a loan from the bank at 5 per cent.

On September 18th Lewis Johnson & Company delivered to the American Security & Trust Company the fifty shares of Southern Pacific stock, and received a check for $2,425, the balance agreed upon. This check and the twenty shares of Northern Pacific stock more than paid for the Southern Pacific stock at its then value, so that after the transaction was completed Williams' margin on the remaining securities was about 47 per cent, as against the 30 per cent margin theretofore carried by him. All his transactions with the brokers were subject to the rules and customs of the New York Stock Exchange and its clearing house.

On September 17, 1914, appellant, who for some time had dealt with Lewis Johnson & Company on a cash basis, delivered to the firm certain securities, including ten shares of Southern Pacific stock indorsed in blank, to be sold and the proceeds invested in Mergenthaler stock. Lewis Johnson & Company then were insolvent, and on November 16th, following, were adjudged bankrupts. The fifty shares of Southern Pacific

stock delivered to the American Security & Trust Company by Lewis Johnson & Company, for the account of Mr. Williams, was made up in part of the ten shares received by Lewis Johnson & Company from Mr. Pirkey.

*Mr. Charles Cowles Tucker* and *Mr. Edward S. Bailey* for the appellant (*Mr. J. Miller Kenyon* and *Mr. H. B. F. Macfarland* being with them on the brief):

1. If a firm of stockbrokers receive from a customer a certificate of stock to sell, but, instead of doing so, fraudulently deliver it to another customer, who had pledged similar stock with the company, upon the latter customer's making a payment on account of the debt owed by him to the firm (which payment is of an amount of money nearly 50 per cent less than the market value of the certificate) the second customer does not become a bona fide holder for value of the certificate as against the true owner, the first customer. As stated by this court in *Trust Co.* v. *Gray,* 12 App. D. C. at p. 291, the right of the transferee of such a certificate, who without notice of the true state of the title takes it from a person who has the possession thereof, but not the title, to hold it against the true owner, is based upon the doctrine of equitable estoppel. Williams has not shown that, relying upon the act of Pirkey in clothing the stockbrokers with the ostensible ownership of this stock, he, Williams, changed his position to his legal disadvantage, so that it would be a fraud upon him to permit Pirkey to show that he is the true owner of the stock. When Williams received Pirkey's stock through the appellee trust company, he owed the brokers $5,600, and they had called for payment of part of the loan. At that time they could have legally enforced the entire indebtedness. 22 Am. & Eng. Enc. Law 2d ed. 871, 872, 897. In other words, Williams was legally bound to pay his debt to them. The fact that they held, or were supposed to hold, his stock as pledgees, to secure the payment of his debt, made no difference in his legal obligation to them. Inducing a party to do an act he is legally bound to do, will

not raise an estoppel. *Western Land Asso.* v. *Banks,* 80 Minn. 317; *St. Croix County* v. *Webster,* 111 Wis. 270; *Hard* v. *Burton,* 62 Vt. 324; 11 Am. & Eng. Enc. Law 2d ed. 439. The incidental fact that when Williams paid his own debt he received Pirkey's property, of course raises no equity in William's behalf. *Organ* v. *Stewart,* 60 N. Y. 413. And, again, an equitable estoppel operates only in favor of him who has been misled by some act of the other party to his injury. *Drury* v. *Gorrell,* 44 App. D. C. 518. The same principle underlies this case as underlaid the case of the *Trust Co.* v. *Gray,* supra, in which this court held that a pre-existing debt due from the ostensible owner of a certificate of stock to the transferee is not a sufficient consideration to support such a transfer, and to defeat the equity existing in favor of the true owner against the party in the possession of the certificate. The reason for this rule is plain. The transferee has not given what the law denominates a valuable consideration for the certificate, nor has he changed his legal position to his injury. On the return of the stock to its true owner, the transferee can recover the debt due from his debtor. A bona fide purchaser is one who has bought property without notice of the claims of third parties thereto, upon the faith that no such claim exists, and who has, therefore, paid or parted with some valuable consideration, or who has in some way altered his legal condition for the worse. *Hayden* v. *Charter Oak Driving Park,* 63 Conn. 147; *Weaver* v. *Borden,* 49 N. Y. 286; Pom. Eq. Jur. sec. 750. Parting with money or money's worth, or an actual change of the purchaser's legal position for the worse. *The Elmbank,* 72 Fed. 610. Money paid, or some present legal interest or estate parted with or changed, or services rendered to the value of the property received. *United States* v. *Banks,* 17 Fed. 322.

2. It may be said that the brokers, when the appellee trust company paid the debt Williams owed them, owed Williams the securities which he had deposited with them to secure the payment of the debt. If so, certainly the brokers had no right to pay that debt with Pirkey's property, and when Williams, or the trust company for him, took it in supposed satisfaction of

that debt, he was merely taking it in settlement of a pre-existing debt, which, according to all the authorities, did not give him the status of a bona fide purchaser for value.    In this case, if the stock in controversy is returned to its true owner, Williams' debit balance will simply be the same amount it would have been had Pirkey's stock not been delivered to him, and he will have the legal right to recover all of his securities from Lewis Johnson & Company, upon payment of his indebtedness to them, or, if they have sold them, to recover a judgment for their value. The fact that the brokers have been adjudicated bankrupts does not change the situation or the rights of the parties.    Such adjudication did not change Williams' legal right to his securities, on payment of his debt.    But, even if it did, there is no evidence showing or tending to show that the brokers were not in the same insolvent condition on September 17, 1914, when they delivered Pirkey's stock to Williams, as they were when they were adjudicated bankrupts, two months later; nor is there any evidence to show that Williams is in any worse legal position now by any act of Pirkey's, so far as the recovery of his securities upon payment of his debt is concerned, than he was on September 17, 1914, when he received his stock.    Of course, as stated by this court in *Trust Co.* v. *Gray,* supra, the burden of the proof is upon Williams to show that he changed his position to his disadvantage, relying upon the act of Pirkey, so that it would be a fraud upon him to submit Pirkey to show that he is the true owner of the stock.

3.  But even if the conclusion should be reached that Williams gave value to the extent of the $2,425 payment he made, for the 50 shares of Southern Pacific stock he received, and was not chargeable with constructive notice, through his agent, the appellee trust company, of Pirkey's ownership of ten shares of that stock, Pirkey is still entitled to relief.    As the record shows, Southern Pacific stock had a market value of $84⅞ per share on September 18, 1914, when Williams received the fifty shares from the brokers, and it had a market value of $102 a share when the case was tried below.    This made Pirkey's ten shares worth $848.75 on September 18, 1914, when the appellee trust

company received them for Williams, and $1,020 when the case was tried. By giving $2,425 for fifty shares, Williams gave $48.50 a share, or $485 for Pirkey's ten shares. This was $363.75 less than their market value when he received them, and $535 less than their market value at the time of the trial. It can hardly be said, without utter disregard of the equities of the situation, that Pirkey, in any event, is not entitled to redeem his stock on payment of the amount of money Williams actually parted with when he received it, which as shown was $48.50 a share or $485. To permit Pirkey to do so, if Williams should be found not to have paid $2,425 on account of his debt, but in the purchase of the stock, would be to apply the same principle that this court applied in *Trust Co.* v. *Gray,* supra, in which the true owner of the stock there in controversy was allowed to redeem it upon payment to the trust company of the actual amount of money it had advanced upon it.

4. But it was contended below and presumably will be contended here that Williams not only paid $2,425 on account of his debt, but surrendered other stock, namely, 20 shares of Northern Pacific, to the stockbrokers in consideration of the delivery to him of Pirkey's certificate of stock, together with other securities. This contention was made, apparently, because, as shown, the amount of money which was paid by Williams on account of his debt was only a little more than one half of the market value of the shares of stock he received, among which were Pirkey's ten shares; and Williams could hardly, with reason, contend that he took Pirkey's stock for value, if it appeared that he parted with an amount of money for it so much less than its true value. There is nothing in this contention for two reasons: First, the record shows that Williams did not part with his Northern Pacific stock in consideration of the delivery to him of Pirkey's stock, but that he delivered it as additional security for the debit balance owed by him to the brokers, and following the demand by them for such additional security, and that he directed it to be sold and the proceeds credited to his account; and, secondly, because the record shows that Williams' Northern Pacific stock was delivered

by him to the brokers on September 8, 1914, while Pirkey did not deliver his ten shares of Southern Pacific stock to them until nine days later; namely, on September 17, 1914. In other words, at the time Pirkey delivered his certificate to the brokers, Williams had already, nine days before, delivered his Northern Pacific stock to them. It is manifest, therefore, that Williams, so far as Northern Pacific stock is concerned, did not change his position to his prejudice by delivering it to the brokers in reliance upon their supposed ownership of Pirkey's certificate, because such ownership was not created by the act of Pirkey until long after Williams delivered his Northern Pacific stock to them.

5. The evidence shows that Williams and his agent, the appellee trust company, had notice of facts and circumstances which put them on inquiry as to the ownership of the stock in controversy, which inquiry, if followed up with reasonable diligence, would have disclosed the truth. 11 Am. & Eng. Enc. Law, 2d ed. 434. Williams, as shown, paid the brokers $2,425, which he borrowed from the appellee trust company, and caused to be transferred to the trust company, as collateral, the stock which the brokers held or were supposed to hold as collateral. In other words, he merely exchanged bankers. Why did he do this if he had no knowledge of the then financial plight of the brokers? But the facts and circumstances which the record shows were known to Williams' agent, the appellee trust company, and with which, of course, Williams is chargeable, assuredly were sufficient to put it on inquiry. *Union Stock Yards Nat. Bank* v. *Gillespie,* 137 U. S. 411.

*Mr. John A. Kratz* for the appellee, Williams.

*Mr. Corcoran Thom* for the appellee, American Security & Trust Company.

Mr. Justice ROBB delivered the opinion of the Court:

In *Richardson* y. *Shaw,* 209 U. S. 365, 52 L. ed. 835, 28

Sup. Ct. Rep. 512, 14 Ann. Cas. 98, it was ruled that, although a broker who carries stocks for a customer on a margin "may not be strictly a pledgee, as understood at common law, he is essentially a pledgee, and not the owner of the stock, and turning it over upon demand to the customer does not create the relation of a preferred creditor, within the meaning of the bankrupt law." The court rejected the contention of counsel for the trustee in bankruptcy, "that the insolvency of the broker at once converts every customer, having the right to demand pledged stocks, into a creditor who becomes a preferred creditor when the contract with him is kept and the stocks are redeemed and turned over to him." There, as here, stocks were held upon a contract requiring the broker, upon demand, to turn over the purchased shares, or similar shares, to the customer upon payment of advances, interest, and commissions. The court said: "These stocks were redeemed and turned over to him [the customer]; as a consequence the relation of debtor and creditor as between the broker and customer did not arise." We see no escape from the conclusion that this decision is controlling here. Mr. Williams merely exercised his right to take up part of the securities carried for him by his brokers, and by that transaction the relation of debtor and creditor "as between broker and customer did not arise." In *Sexton* v. *Kessler,* 225 U. S. 90, 97, 56 L. ed. 995, 1000, 32 Sup. Ct. Rep. 657, the court said: "When a broker agrees to carry stock for a customer, he may buy stocks to fill several orders in a lump; he may increase his single purchase by stocks of the same kind that he wants for himself; he may pledge the whole block thus purchased for what sum he likes, or deliver it all in satisfaction of later orders, and *he may satisfy the earlier customer with any stock that he has on hand or that he buys when the time for delivery comes.*" See also *Duel* v. *Hollins,* 241 U. S. 523, 60 L. ed. 1143, 36 Sup. Ct. Rep. 615.

Mr. Williams testified that the first intimation he received of the financial plight of his brokers was on the 19th of October, 1914, and there is no evidence to the contrary. Indeed, the circumstantial evidence strongly corroborates Mr. Williams,

for he had a right to take up all his securities, or withdraw the excess of his margin over 10 per cent, unless there was some agreement to the contrary, which the record does not disclose. And yet, after taking up the fifty shares of Southern Pacific stock, his balance was increased from $2,400 to $2,600, and his margin from about 30 per cent to about 47 per cent. It may be that the American Security & Trust Company had reason to suspect that all was not well with Lewis Johnson & Company, but nothing was said about this by the officials of that bank to Mr. Williams, and under the facts disclosed knowledge may not be imputed to him, for the agency of the bank was limited to receiving the fifty shares of stock and the delivery of the check for $2,425.

It would be difficult, however, under any view of the case, to reach the conclusion that Mr. Williams was not a purchaser for value. The brokers did no more with Mr. Pirkey's stock than they were authorized to do; and even though Mr. Williams had known from what source they obtained these ten shares of stock, he could not have known that they would fail to invest the proceeds which they received from him in Mergenthaler stock, as directed by Mr. Pirkey. They still were a going concern, and apparently doing business as usual. As a matter of fact, Mr. Williams had no knowledge of Mr. Pirkey's transactions with the brokers, and, like Mr. Pirkey, he had the right to assume that they would act in good faith toward all other customers. This, therefore, is a case where one of two innocent parties must suffer by the act of a third, and, as Mr. Pirkey, by his indorsement in blank, made possible the loss, he must bear it. *National Safe Deposit Sav. & T. Co.* v. *Hibbs,* 229 U. S. 391, 57 L. ed. 1248, 33 Sup. Ct. Rep. 818.

. The decree is affirmed, with costs.            *Affirmed.*