## In re B. SOLOMON & CO.

### Petition of KAHN.

(Circuit Court of Appeals, Second Circuit. July 3, 1920.)

No. 207.

1. **Bankruptcy** ⟨⟩**140(3)—Purchaser through bankrupt stockbroker may reclaim stock of same kind.**

Where a stockbroker at the time of his bankruptcy had in his possession certificates of stock of the same kind as that bought for a customer, the customer is entitled to reclaim such certificates, whether or not they are the identical ones bought for him.

2. **Brokers** ⟨⟩**31—Cannot buy from or sell to customer.**

A stockbroker employed by a customer cannot, without the knowledge and consent of the customer, fill the order with stock owned by himself.

Appeal from the District Court of the United States for the Southern District of New York.

In the matter of B. Solomon & Co., bankrupt. On petition of Leo Kahn to revise an order of the District Court. Affirmed.

Leo Kahn filed a petition in the court below in which he alleged: That Benjamin Solomon, Joseph H. Sugarman, and Philip Kastel were partners in business under the name of B. Solomon & Co., and were engaged as brokers for the purchase and sale of stocks and other securities, with an office in the city of New York. That prior to July 25, 1918, Leo Kahn directed the above firm to keep for him and credit his account with 11,500 shares of Tuxpam Star Oil Corporation stock. That prior to July 24, 1918, he (Kahn) had been notified by B. Solomon & Co. that they had purchased and held for his account 11,500 shares of stock in the Tuxpam Star Oil Corporation. That the stock was fully paid for, and that no lien existed against it in favor of B. Solomon & Co. That prior to the said July 24, 1918, he (Kahn) had delivered to the aforesaid firm for safe-keeping 900 shares of the stock of the Keystone Oil Company, and that against this stock no lien or charge of any character existed in favor of B. Solomon & Co. That on July 25, 1918, a petition in bankruptcy was filed against B. Solomon & Co., and the firm was declared bankrupt, and a receiver was appointed. That thereafter, and on August, 1918, he (Kahn) made a demand upon the receiver for the delivery of the aforesaid stocks, and the demand was refused. That petitioner asked for an order directing the receiver to turn over to him (Kahn) the stocks above referred to.

The receiver admits that he received 900 shares of stock in the Keystone Oil

Company and 4,000 shares of the stock of the Tuxpam Star Oil Company. He claims that Kahn is indebted to the estate in the sum of $1,101.60 upon a check dated July 24, 1918, which check he claims was given to the bankrupts by Kahn "in payment of the purchase price of certain stock." He also claims a lien on all the securities for the payment of the check, and therefore asks that the prayer of the petition be denied.

The question thus raised was referred to a special master, and he reported, recommending that the claimant, Kahn, should pay to the receiver the amount of $1,101.60, with interest, and that thereupon the receiver be directed to surrender to the claimant the 900 shares of Keystone stock and the 4,000 shares of Tuxpam stock now in his (the receiver's) hands in full of all claims which the said Kahn has against the said receiver.

Exceptions were taken to the report, and were overruled by the District Judge, who confirmed the special master's report.

Zalkin & Cohen, of New York City (Moses Cohen and Nathan Coplan, both of New York City, of counsel), for receiver.

Randolph M. Newman, of New York City (L. C. Whiton, of New York City, of counsel), for relator.

Before WARD, ROGERS, and HOUGH, Circuit Judges.

ROGERS, Circuit Judge (after stating the facts as above). The petitioner is a third party, reclaiming his property from a receiver appointed in bankruptcy, so that the controversy is one arising in bankruptcy proceedings, and an appeal is the proper remedy, under section 24a of the Bankruptcy Act (Comp. St. § 9608).

While the petition alleges that the bankrupt firm had in its possession 11,500 shares of the Tuxpam stock belonging to claimant, the evidence discloses that only 11,000 shares were delivered to it. The special master did not think that the evidence showed the delivery of any of this stock. We do not agree with him in that conclusion. When the claimant was testifying as to this stock having been turned over, the counsel for the bankrupts interrupted and said:

"Mr. Referee, we acknowledge all those things. There is no issue as to that. All the stock was turned over. Why go to all this to find it out? We have practically acknowledged by our papers that the stuff was turned over to Solomon & Co., but we deny that it was in our possession."

It is true that his client, when testifying later, declared that he had never received "10,000 shares of Tuxpam Star Oil from Mr. Kahn." But the record contains a letter, written on the stationery of B. Solomon & Co., dated June 1, 1918, and signed by Kastel, who had authority to sign it for the firm, which says:

"I beg to confirm my recent conversation with you, stating the fact that I have become associated with the above-named firm, and have theretofore transferred all interests in the business heretofore conducted under the name of Kastel & Co. to this firm. Among the accounts thereby transferred is yours, consisting of 10,000 shares of Tuxpam."

There is another letter, dated June 4, 1918, in which receipt is acknowledged of 500 shares of Tuxpam oil. After Solomon testified that he had not received the 10,000 shares of Tuxpam stock, he was asked as follows:

"Q. Do you remember Mr. Kahn coming to your office, and, in the presence of Mr. Kastel and Mr. Kahn and myself, Mr. Kastel saying to you, 'Mr. Solo-

mon, will you kindly bring in out of the safe the 10,000 shares of Tuxpam Star Oil of Mr. Kahn's?" A. I do not.

"Q. Do you remember going to the safe and bringing 10,000 shares of Tuxpam Star Oil? A. I brought in more than 10,000 shares.

"Q. And did you hand them to Mr. Kastel? A. Mr. Kastel sent in the boy for Tuxpam, and I sent it in to him.

"Q. And were you in the room? A. In what room?

"Q. With Kahn and Kastel? A. I was not.

"Q. But you sent in the stock? A. I sent in the stock."

[1] It is reasonably clear that this stock got into Solomon's possession. Whatever became of the stock thereafter we are unable to say. We are also unable to say whether the 4,000 shares of Tuxpam stock, which the receiver admits he found when he took possession, were the identical shares which were originally turned over as the property of the claimant; but, as no one else is claiming them, it is not important whether they are or not.

In Richardson v. Shaw, 209 U. S. 365, 28 Sup. Ct. 512, 52 L. Ed. 835, 14 Ann. Cas. 981, the court declared that a certificate of stock is not the property itself, but the evidence of the property in the shares, and that, as one share of stock is not different in kind or quality from every other share of the same issue and company, the return of a different certificate, or the right to substitute one certificate for another of the same number of shares, is not a material change in the property right held by the broker for his customer. In Sexton v. Kessler, 225 U. S. 90, 97, 32 Sup. Ct. 657, 56 L. Ed. 995, the doctrine above stated was recognized, and it was said that if a broker had in possession the stock of a customer, which he disposes of to others, he may, when called upon to make delivery to that customer, satisfy the demand by delivering "any stock that he has on hand or that he buys when the time for delivery comes." And in Gorman v. Littlefield, 229 U. S. 19, 33 Sup. Ct. 690, 57 L. Ed. 1047, the court held that where the trustee of a bankrupt broker finds in the estate certificates for shares of a particular stock legally subject to the demand of the customer, for whom shares of that stock were bought by the bankrupt, the customer is entitled to the same, although the certificates may not be the identical ones purchased for him. In the recent case of Duel v. Hollins, 241 U. S. 523, 36 Sup. Ct. 615, 60 L. Ed. 1143, the court said that in dealings between brokers and customers stock certificates issued by the same corporation lack individuality; they are like receipts for coin, to be treated as indistinguishable tokens of actual values.

It is clear, therefore, that if the receiver has certificates for 4,000 shares of the stock, the claimant is entitled to obtain possession of them, after discharging his indebtedness to the bankrupts, if indebted he is. The petitioner in this proceeding is in this court assigning for error that the special master erroneously found that the check for $1,101.60, and upon which the petitioner had stopped payment, was rightfully the property of the bankrupt firm, and should be paid to the receiver before the latter should be required to surrender the stocks which were found in his hands and which belonged to Kahn.

The claimant stopped payment on this check upon the ground that it represented the purchase price of certain stocks known as Lone Star

stocks, and other stocks which Kahn alleges were sold to him by the bankrupts upon fraudulent representations. The special master was unable to find any evidence of such fraudulent representations, made by the bankrupts or by any one else in their behalf.

The evidence discloses that B. Solomon & Co., through Kastel, one of the firm, was engaged in "rigging the market" as respects the Lone Star stock. The counsel for the claimant was present in Kastel's private room in the firm's offices, although he testified that he did not go there as counsel for the claimant, but was there on his own business, and while there Kastel was using the telephone wire connected with the booth on the curb, and talking over it with regard to Lone Star stock, and was fixing the price of the stock. The following is an excerpt from his testimony:

"Q. What did Mr. Kastel say over the wire as regards the price of Lone Star? A. He said, 'Make the market 22 cents.'

"Q. What next did he say? A. 'Make the market 23 cents.'

"Q. What next did he say? A. 'Make the market 24 cents.'

"Q. What next did he say? A. 'Make the market 25 cents;' 'Make the market 26 cents; 27 cents; 28 cents; 28½ cents; 27 cents; 27½ cents; forward and backward—28½.' After he had had the prices fixed up to about that figure, while Mr. Kahn was there, he said, 'You see I have put you now in at 27 cents,' although some of it was 27½ cents; 'I will let you have 4,000 shares at 27 as a favor to you and Mr. Newman, and we are going to have this stock go as high as a dollar, and you will make a good thing out of it. We took in yesterday $50,000 worth of stock. We paid through our banks $54,000 worth of checks yesterday, and to-day we are paying through the bank again about $28,000 or $30,000 for Lone Star stock. This is going to be the biggest thing we have ever handled. You will be able to get out of this stock shortly with a nice profit.'"

Then the claimant's counsel was asked and testified as follows:

"Q. You knew he was rigging the market? A. I personally knew he was rigging the market.

"Q. And you told that to Mr. Kahn, did you? A. No; I didn't tell that to Mr. Kahn.

"Q. What did you tell Mr. Kahn? A. I told Mr. Kahn that, from what I knew of Kastel, he should make a lot of money.

"Q. Did you tell Mr. Kahn how Mr. Kastel was working this stock? A. I told Mr. Kahn that Mr. Kastel was working the market, and that in my opinion it was an effort to squeeze the bucket shops.

"Q. You knew it was an effort to squeeze the bucket shops? A. That I believed that was what they were driving at."

It was for Lone Star stock bought at this interview, 4,000 shares bought at 27 cents, together with interest, that this check for $1,101.60 was given. The check was given when the Lone Star stock was handed over to Kahn. That stock is still in the possession of the latter, and there is no testimony showing that he ever offered to turn back the stock to the bankrupt; and the question is whether Kahn, who gave the check in payment and then ordered the bank not to pay it, still owes to the bankrupt firm the amount which the check calls for. Payment of the above check was stopped by the maker on the ground, as has been stated, that it was given in payment of the Lone Star stocks, which it alleged were sold to him by the bankrupts upon fraudulent representations made by the latter to the former.

We have examined carefully the evidence in the record, and we are unable to discover that any fraudulent representations were made as alleged. On the contrary, the evidence shows that the claimant must have bought the stock with knowledge that the market was being "rigged," and artificial prices created. We must conclude that Kahn hoped to get in and get out before the bubble burst. He hoped that things would be so shaped that the price would go up. In that hope he had put into that stock $1,050, and he expected that things would be so manipulated that he would be able to double the amount put in. The matter turned out differently, as is generally the case in such transactions. Kahn took the risk and lost. The result does not afford any justification for the claim that he was fraudulently imposed upon and is entitled to be released from his obligation to pay the amount called for in the check.

[2] Kahn also claims, however, that the 4,000 shares of the Lone Star stock for which this check was given were not purchased on the market by the bankrupts, but were shares which belonged to the bankrupt firm, and were sold to him without disclosure. If that were the case, there might be reason for repudiating the transaction. In Stiebel v. Lissberger, 166 App. Div. 164, 151 N. Y. Supp. 822, a customer directed his brokers to sell for his account certain stocks which the customer owned and which the brokers had in their possession. The brokers without the customer's knowledge became themselves the purchasers of the stocks, and credited him on their books with the proceeds of sale. They claimed that since the purchase was made at the market price on the day of sale the customer suffered no damage. The facts were not discovered by the customer until three years thereafter, when he tendered to the brokers the amount they reported they had sold the stock for and made a demand for the stock, which was refused. The refusal was treated as a conversion, and he was allowed to recover the market price of the stock at the time of the conversion. The principle upon which the case was decided was that a broker, in selling his customer's stocks, is in the position of a trustee, and the law will not allow of the temptation to fraud through the trustee becoming purchaser at his own sale.

If the broker cannot purchase his customer's stocks at a sale he has been authorized to make, can he sell his own stocks to a customer who has given him an order to purchase? If he cannot buy from his customer, has he any better right to sell to his customer? The relation existing between a broker and his customer is ordinarily regarded as one of special agency. Robertson v. Allen, 184 Fed. 372, 107 C. C. A. 254. It is not, however, everywhere regarded as a fiduciary relation. Furber v. Dane, 204 Mass. 416, 90 N. E. 859, 27 L. R. A. (N. S.) 808. In 9 C. J. 528 it is said:

"If a broker, employed to purchase property, buys it for himself, he is considered a trustee for the principal. A broker, employed to sell property, cannot become buyer thereof, either directly or indirectly."

And we may concede, for the purposes of this case, that a broker who is employed to buy stocks for a customer cannot sell to his customer the broker's own stocks, without a disclosure of the fact that he

is selling his own. The rule is well settled, and is stated in Dos Passos on Stockbrokers and Stock Exchanges, vol. 1 (2d Ed.) p. 365, where it is said that—

"The general rule of law which governs the relation of principal and agent is applicable to that existing between a stockbroker and his client; and it is well settled that an agent cannot, without the knowledge and consent of his principal, either sell to or buy from the latter. The principle is based upon the obvious reason that, the position of an agent being one of trust and confidence, many frauds and undue advantages would creep in if the law sanctioned his dealing with his principal in his own behalf. Such a transaction is therefore considered a breach of the agent's duty, and the contract is subject to rescission, irrespective of any question of intentional fraud or actual injury. The law rejects indiscriminately all transactions, whether purchases from or sales to the agent, and whether there is any evidence or intention of fraud or not."

It is, however, held that, if stockbrokers deal in securities on their own account, they may sell such bonds as vendors to their clients as vendees. The relation between them is then that of vendor and vendee, not that of principal and agent. Porter v. Wormser, 94 N. Y. 431, 442.

We should examine more fully into the rule of law above referred to in its application to brokers, if the facts in this case justified it. But the difficulty is that there is an utter failure on the part of the claimant to show that the 4,000 shares of stock under consideration belonged to the bankrupts. It does not appear from what source the stock was derived. Solomon testified that the stock was not the stock of the bankrupts. He stated that he was buying stock for a good many customers, and had none of his own; that what Kahn got was stock which had been bought for some one else, but was not Solomon's. It appears that Solomon bought from one Strasbourger 4,000 shares for account of Kahn, and that he never took that stock up, and never paid Strasbourger for it. If Solomon had owned 4,000 shares which he proposed to turn over to Kahn, he would hardly have contracted with Strasbourger for the 4,000 shares he bought or agreed to buy from him. Solomon may have testified falsely, and we admit that we are not very favorably impressed by his testimony throughout; but the fact remains that there is no testimony in this record which shows that the 4,000 shares which Solomon turned over to Kahn ever belonged to Solomon. In the absence of such testimony, and in the face of the positive testimony of Solomon that the stock was not his, and the acceptance of that testimony as true by the special master and the District Judge, we are unable to hold that what Solomon sold was his own stock; and it not being established that the stock was his own, or that any fraudulent misrepresentations of fact were made and were relied upon, we must conclude that no reason is shown which justified Kahn in stopping payment on this check.

Decree affirmed.