**In re BYRNE et al.**

**Ex parte MOHR et al.**

Circuit Court of Appeals, Second Circuit.
April 8, 1929.

No. 246.

Murray Corrington, of New York City, for appellants.

Simpson, Thacher & Bartlett, of New York City (Louis Connick and Ira A. Hawkins, Jr., both of New York City, of counsel), for appellee.

Before MANTON, L. HAND, and AUGUSTUS N. HAND, Circuit Judges.

L. HAND, Circuit Judge (after stating the facts as above). ▪ The appellants have quite misapprehended their rights and have proceeded throughout on the assumption that they are entitled to the same relief in bankruptcy as they would have had against the bankrupts in personam. Their claim is not that, but against the res administered in the bankruptcy court. To get any standing, except as general creditors, they must identify the original assets, or trace them into other specific funds which came into the trustee's hands. It is not enough to show that they were converted by the bankrupts, or indeed that they may have generally enriched their estate. National City Bank of New York v. Hotchkiss, 231 U. S. 50, 34 S. Ct. 20, 58 L. Ed. 115; Schuyler v. Littlefield, 232 U. S. 707, 34 S. Ct. 466, 58 L. Ed. 806; St. Louis & S. F. R. R. v. Spiller, 274 U. S. 304, 310, 47 S. Ct. 635 (71 L. Ed. 1060); In re McIntyre & Co., 185 F. 96 (C. C. A. 2); In re Ennis, 187 F. 728 (C. C. A. 2); In re Matthews' Sons, 238 F. 785 (C. C. A. 2); In re Ruskay, 5 F.(2d) 143, 144 (C. C. A. 2); In re Pacat, 27 F.(2d) 810, 813 (C. C. A. 2). The claimant has the burden of identification in such cases, and the appellants at bar have made no effort to discharge it. To the extent that the bankrupts' books acknowledge the identity they can prevail, but no further; the balance of their claim is a general credit against the trustee, and we are not here concerned with its liquidation.

It makes no difference that the bankrupts were charged with notice that the executors had no authority to buy securities for the estate, or to trade at all for their mother. A broker, converting the securities of an individual customer, is as much a trustee ex maleficio as one who acquiesces in the devastavit of an executor, or in the conversion of one who has no authority to act at all. In the first case he makes himself a trustee by his own wrong; in the second, by participating in the wrong of his customer. However personally liable he may be, when the question arises of sharing in what is left, the aggrieved beneficiaries are in the same case as a wronged customer. We pass as frivolous the argument that the trustee, not having appealed, is not in a position to defend the order because of this failure in the appellants' proof.

Had it not been for the fact that in disposing of the securities acknowledged to be on hand, either in the bankrupts' box or in their loans, the referee used a debit balance of $13,658.83, we should therefore affirm the order without further comment. The utmost that the appellants could recover would be the securities which the account showed, traced as the referee has traced them. But, as he made his award by subtracting from the amount so traced the debit balance, it is essential to the correctness of the order that this balance shall be correct. The bankrupts' books, which were received in evidence, showed advances for cash withdrawn of about $80,000, of which $68,000 was proved to have been paid to the executors upon checks drawn to their order. While they swore that they had repaid part of these, and proved one or two repayments by documentary evidence, their testimony, especially that of Fred J. Mohr, was of the most unsatisfactory character, and justified the referee in ignoring whatever was not corroborated by written evidence.

▪ The will gave the executors power to "sell, mortgage, * * * or incumber" the property, and unless the bankrupts had notice that the executors were committing a devastavit, payments to them were valid, though resulting in a pledge pro tanto of the securities. The mere fact that the checks were drawn to the order of the executors was not such notice. Havana Central R. R. v. Central Trust Co., 204 F. 546 (C. C. A. 2), L. R. A. 1915B, 715; Bischoff v. York-

ville Bank, 218 N. Y. 106, 112 N. E. 759, L. R. A. 1916F, 1059. Although the facts are different, Empire Trust Co. v. Cahan, 274 U. S. 473, 47 S. Ct. 661, 71 L. Ed. 1158, 57 A. L. R. 921, depends upon essentially the same principle, as does Whiting v. Hudson Trust Co., 234 N. Y. 394, 138 N. E. 33, 25 A. L. R. 1470, except for the certification of the check, which we cannot think relevant. So, too, of the result, if not the reasoning, in Havana Central R. Co. v. Knickerbocker Trust Co., 198 N. Y. 422, 92 N. E. 12, L. R. A. 1915B, 720. The indorsements on the checks added no information to charge the bankrupts. Neither section 104, nor section 231 of the Surrogate's Court Act has changed the rule of Bischoff v. Yorkville Bank. Manufacturers', etc., Co. v. U. S. Mortgage & Trust Co., 122 Misc. Rep. 726, 204 N. Y. S. 105; Id., 213 App. Div. 345, 210 N. Y. S. 613; Id., 244 N. Y. 550, 155 N. E. 893. As to the decedent's assets, the bankrupts were therefore justified in allowing the withdrawals, though the same is not true of the mother's securities, which cannot be charged.

So far as the debit comprised charges not traced to withdrawals by the executors themselves, we think the proof was prima facie sufficient. The petitioners put in evidence this account as it appeared in the bankrupts' books. The executors received regular statements from the bankrupts while the joint account was current, and these became accounts stated, so far as they personally were concerned. They were not challenged, and are conclusive, except so far as the impropriety of the charges affirmatively appears. Some of the charge items were, however, proved to be improper. While the executors had power under the will to sell, they did not have power to buy stocks, and in so far as they did the bankrupts were charged with notice of their misfeasance; the form of the original account gave them such notice. Upon any such purchase they could not charge commissions, and they were liable for any losses which resulted. The total losses, as shown by the master's report, were $5,424, against which he offset the profits on other transactions, making a net loss of some $3,000. But such an offset is not permissible by a misfeasant executor or one in privity with him. As the case must go back for a recomputation, we need not consider the details further.

The widow must first receive from the total award ($20,102.75) her share in the securities traced into the loans; she has already received those in the box, that is, the Intercontinental Rubber shares, and will receive the whole recovery of Ray Consolidated, as the estate had no interest in it. As to the Kelly Springfield stock, she will share with the estate in the total recovery for that stock from all sources, in the proportion that the number of her shares bore to the estate's on April 23, 1920.

The balance of the total award will bear the debit, which will presumably be less than the master found, $13,658.83. The difference so found, to the extent of $6,443.92, less the widow's share, belongs to the executors, regardless of their devastavit; the trustee has no interest in it, since he would be liable for so much, even if the executors had been individual customers. He will therefore pay this to them unconditionally. The same is not true, however, of any sum by which the debit may be falsified. This by hypothesis is due to the fact that the bankrupts were dealing with property which the executors were not authorized to buy, or that withdrawals may be shown not to be chargeable to the estate. The widow has a legal life interest in this, as in all the assets; the executors each a vested remainder, with cross-remainders over to the survivor in case either died without issue. These contingent cross-remainders were bequeathed as follows: "Should either of my children die leaving no lawful issue him surviving * * * the share or portion of such child * * * (I bequeath) to such child as shall survive, and to the issue of such child, forever." If the words, "to the issue of such child forever," are words of limitation, and not of purchase, the absolute interest in the property was vested in the widow and the two sons. If words of purchase, there were contingent remainders bequeathed to the issue of the survivor.

It is obvious that the phrase, "to the issue of such child," cannot create a contingent remainder on the death of the survivor; it does not suggest that the interest so created shall be deferred until his death. It is perhaps theoretically possible to construe it as a contingent remainder to the surviving son and his children at the time when his brother dies, per capita; but that is an absurd intention to impute to the testator. He cannot have meant to divide a deceased brother's share among the survivor and his children then living, to the exclusion of any born thereafter, nor is it likely that he meant to compel the son to share with his own children. Nothing of the kind was done as to the share originally bequeathed. We can see no tenable construction, except that the words were used in limitation, and that the

192

cross-remainder was absolute. The normal presumption is that "issue" is a word of limitation, equivalent to "heirs of the body." Doe v. Ruecastle, 8 C. B. 876; Slater v. Dangerfield, 15 M. & W. 263, 272; Kingsland v. Rapelye, 3 Ed.. Ch. 1; Drake v. Drake, 134 N. Y. 220, 225, 32 N. E. 114 (17 L. R. A. 664).

Thus the only interest in the possible fund now discussed, which was not concluded by the acts of the executors themselves, was the widow's; the remainders belonged to them, and they have no right to complain of what they authorized. Therefore, if the widow's interest is protected, there is no party aggrieved. Its present value can be actuarially estimated; with it she can buy an annuity equal to the interest upon the sum which may be found due. To so much she is entitled, and to no more; in no other way can the estate be closed. This does no violence to any contingent remainder, nor does it even imperil one, as was allowed in Woodbridge v. Bockes, 170 N. Y. 596, 63 N. E. 362.

The order will therefore be reversed, and the cause remanded, with the following directions: First, to restate the amount of the debit fixed at $13,658.83, allowing the executors to falsify any items therein appearing, but in accordance with the foregoing. When the debit is restated the distribution will be as follows: From the gross amount of $20,102.75, the recoverable value of the traced securities, deduct the value of the widow's separate assets. From the balance remaining deduct the amount of the debit as reliquidated. This will represent the recoverable value of the estate's assets. From this pay outright to the executors $6,443.92, less the amount paid to the widow for her separate securities. As an illustration, the recoverable value being $20,000, suppose the widow's share to be $1,000; the debit, $9,000. The recoverable value of the estate's assets will be $20,000, minus $1,000, minus $9,000, or $10,000. After paying the executors $5,443.92, there will remain $4,556.08, the result of the change in the debit balance. Interest on this at 5 per cent. is say $225 a year, the annuity due the widow while she lives. Find from actuarial tables the present value of such an annuity for her present age (say $1,350), and pay her the same out of $4,556.08, the trustee to retain the remainder. Any income received by the trustee since August 6, 1924, is to be added to the widow's share.

Decree reversed, without costs, and cause remanded for further proceedings in accordance with the foregoing.