## In re ROSENBAUM GRAIN CORPORATION.

### LEONARD et al. v. NAIRN.

#### No. 7110.

Circuit Court of Appeals, Seventh Circuit.
May 22, 1940.

W. Ward Smith, of Chicago, Ill. (Ernest May, of Fort Worth, Tex., of counsel), for J. M. Leonard and O. P. Leonard, claimants-appellants.

George E. Q. Johnson, Luther D. Swanstrom, Walter E. Wiles, and Wm. B. Basile, all of Chicago, Ill., for appellee.

Before SPARKS, TREANOR, and KERNER, Circuit Judges.

KERNER, Circuit Judge.

In this case the appellants J. M. Leonard and O. P. Leonard are marginal grain customers of the debtor Rosenbaum Grain Corporation. These customers filed priority claims against the estate of the debtor commodity broker. In its order the District Court denied appellants priority of payment and relegated them to the position of general creditors. From this order the appeal here was taken.

On certain days in February, March and April of 1935 appellants placed orders for May and September wheat and deposited their margins, O. P. Leonard depositing $1,960.51 and J. M. Leonard $4,160.72. The debtor executed the orders according to instructions.[1] On April 23, 1935, the debtor was suspended from

---

[1] In February O. P. Leonard placed orders for 20,000 bushels of May wheat and the broker purchased for him 15,000 bushels at 98¼ and 5,000 at 97. He ordered 15,000 bushels of September wheat and the broker purchased the same for him at 91¼.

In March J. M. Leonard placed orders for 50,000 bushels of May wheat and the purchase price was 97⅞. He ordered 50,000 bushels of September wheat and the purchase price for 10,000 bushels was 90⅝ and for 40,000 was 91¼.

The 70,000 bushels of May wheat were sold at a price of 99½ cents per bushel, 30,000 bushels of September wheat at 98 cents per bushel and 35,000 bushels at 98⅛ cents per bushel, and the proceeds

the Chicago Board of Trade and its voluntary petition for corporate reorganization was filed under § 77B of the Bankruptcy Act, 11 U.S.C.A. § 207.

The purchases were made subject to the rules on the Chicago Board of Trade. Under Rule 310 the contracts were required to be cleared through the Clearing House and they were cleared through the Clearing House on the respective days they were made. On each such day the purchases went into the final standing of the debtor with the Clearing House, and as so absorbed into the net position of the debtor with the Clearing House they were carried over from day to day until the suspension of the debtor. The term "net position" means the difference between the aggregate amount of "long" contracts and "short" contracts carried by the debtor with the Clearing House.

At the close of business April 23, 1925, the debtor's net position in the Clearing House, with respect to May wheat, was short 1,715,000 bushels. On September wheat it was long 380,000 bushels. On April 25, 1935, the trustee, pursuant to the order of the District Court, rejected all executory contracts pertaining to the purchases or sales of grain for future delivery and thereupon all the open wheat contracts carried by the debtor were closed out. On the closing out of these contracts debtor made no profit, but was debited $10,133.75 as a result of the closing out of the wheat contracts. Its net debit upon all the transactions closed was $1,-672.50. However, the margins deposited with the Clearing House—adjusted daily and securing the debtor's net position with the Clearing House—were sufficient to cover the net loss plus $44,023.75, which the Clearing House paid over to the trustee.

In due season appellants filed priority claims against the estate of the debtor for $12,362.37.[2] John L. Nairn, trustee, objected to the claims as not being entitled to priority of payment and the matter was referred to a special master for consideration. The master recommended that the claims be classified as general creditors' claims. Appellants then filed exceptions to the report, and the District Court overruled these exceptions, stating that "there is no particular fund to which the claim of the claimants can attach and they are in the position of general creditors."

Now, at the close of business on the certain days above mentioned, the debtor reported the trades in question to the Clearing House for clearance. We know that as soon as the futures contracts are reported, they are deemed to be assumed by the Clearing House and the reporting brokers are freed from their inter-broker responsibility as buyers or sellers. Rules 310 and 314, Rules of the Chicago Board of Trade. But these contracts, as in the instant case, may remain open upon the books of the brokers, and if they do they carry the brokers' responsibilities to their customers.[3] See Rules 315, 316(b) (c);

---

of such sales were received by the trustee and are a part of the assets of the estate.

In the petitions for reclamation O. P. Leonard claimed $3200.07 and J. M. Leonard $9162.30.

[2] Appellee states that the claimants did not file reclamation petitions. From the record it appears that on the back of each petition the particular claimant refers to the "foregoing petition for reclamation." Moreover, from the proof adduced as to these claims, it is obvious that appellants were seeking to establish that their equities are superior to those of general creditors of the debtor's estate. We are satisfied that in this regard the petition is proper.

[3] The clearing process—the process of daily reports, clearance, and settlement—presents a picture of the Clearing House and its relationship to the Exchange. Its significance in the instant case arises from the contention by appellee that by virtue of the clearing process the futures contract as a res held in pledge by the broker for his customer is either altered or made impossible of identification.

It is true that clearance substitutes the Clearing House as buyer or seller to each trade (as principal) and that the offset operation reduces the commitments between the Clearing House and the broker to purchases and sales of the broker's net position. See Rules 310, 314 and 315 of the Chicago Board of Trade; see also Board of Trade v. Christie Grain & Stock Co., 198 U.S. 236, 248–250, 25 S.Ct. 637, 49 L.Ed. 1031.

Thus, when brokers clear their trades with the Clearing House, they are freed from inter-broker responsibility and the Clearing House assumes the liabilities of the principals. But as the trades are offset, the Clearing House releases itself from the liabilities of the principals. And as to any contract still open on the books of the brokers for the accounts of

Hoffman, Futures Trading Upon Organized Commodity Markets (1932), p. 225.

■ The basic question here concerns the rights of the marginal customer upon the bankruptcy of the commodity futures broker. This is part of the complex problem · of distributing the assets (which remain) among the customers and the general creditors. Ordinarily every claimant to the assets in the hands of the trustee of the bankrupt's estate desires priority and for that reason seeks to establish that his property was acquired under circumstances giving rise to a relationship other than that of an unsecured creditor. But another requirement is generally recognized. The noncreditor claimant has the burden of proof and must be able to trace his property into the hands of the trustee in bankruptcy. If his evidence leaves the identification in doubt, the doubt must be resolved in favor of the trustee. Richardson v. Shaw, 209 U.S. 365, 28 S.Ct. 512, 52 L.Ed. 835, 14 Ann.Cas. 981; Gorman v. Littlefield, 229 U.S. 19, 33 S.Ct. 690, 57 L.Ed. 1047; Schuyler v. Littlefield, 232 U.S. 707, 34 S.Ct. 466, 58 L.Ed. 806; Duel v. Hollins, 241 U.S. 523, 36 S.Ct. 615, 60 L.Ed. 1143; In re Byrne, 2 Cir., 32 F.2d 189, 190.

Recently in Nairn v. J. A. Acosta & Co., 7 Cir., 103 F.2d 656, this court decided that the necessary mutuality required by § 68, sub. a of the Bankruptcy Act, 11 U.S.C.A. § 108, sub. a, existed, where the transactions involve on the one hand the carrying of stock certificates by the stock broker for his marginal customer and on the other hand the carrying of commodity contracts by the grain broker for his marginal customer. In the course of the opinion the court expressed itself as to the legal status of the relationship between grain broker and his marginal customer. For instance, a typical statement appears on page 662 of the opinion in 103 F.2d: "In substance * * * the law [in Illinois] is that the stock broker is essentially a pledgee and the grain broker is essentially a pledgee in equity."

■ In this case counsel argue over the binding effect of the language above stated. A reading of the Acosta opinion leads to the obvious conclusion that the language above (and similar language found in the opinion) is not indispensable to the decision therein. However, we have considered this again and conclude that the language in question is a proper expression of the law applicable in these matters. The relationship of a commodity futures broker and his customer is analogous to that of the stock broker and his customer. The same law applies to one as to the other. The grain broker holds the commodity contracts in pledge for his marginal customer.

■ That commodity contracts constitute property held in pledge, does not necessarily compel priority of payment for the pledgor. Nor does it establish without more a case of reclamation by the owner. If the customer can not trace his property he can not reclaim, no matter what the equities are. Instead he is relegated to the position of asserting his rights as a general creditor.

■ The reclamation petitions in question plainly show that each appellant sought to reclaim two separate properties, namely, the money deposited with the debtor as margins and the profits which accrued from the liquidation sale of the contracts. The District Court treated these petitions as presenting claims to two separate funds and held that the appellants had not complied with the tracing requirement. Appellants' counsel admitted in his brief that the petitions set forth "margins" and "profits" separately but argued that they should be treated as if they had presented a claim to one sum.[4] In view of the record on appeal, we are not ready to

---

their customers, the brokers in effect are substituted in place of the Clearing House. See Rule 316 of the Chicago Board of Trade; see also Hoffman, Futures Trading Upon Organized Commodity Markets (1932), p. 225.

Settlement between Clearing House and broker takes place in the form of broker payment of variation margin or Clearing House credit. For each contract listed by the broker on the report made to the Clearing House (and not offset), he must make a deposit known as the original margin. From day to day this contract is adjusted to a closing or settlement price established by the Clearing House. The effect of adjusting these daily variations in the market is to bring the price of every open contract up to the last day's close. Thus the variation margin reflects profits and losses. Baer and Woodruff, Commodity Exchanges (1929), pp. 57, 60, 71.

4 The Court speculates as to the nature of counsel's argument if the situation had been as follows: a loss of $100 from the

conclude that the District Court's treatment of the petitions (as presenting claims based on two separate funds) is erroneous.

Counsel for appellee argues, and the District Court in effect concluded, that the clearing process either alters the commodity contracts or makes tracing impossible and that therefore appellants are in no better position than are the general creditors of the estate. We have given serious consideration to this argument but we can not indorse it as meritorious. To give heed to it is to shift emphasis from the broker-customer relationship to the relationship between the Clearing House and its clearing members. In issue here is the broker-customer relationship and the tracing of the appellants' commodity contracts. Yet let us study the effect of the clearing process upon the matters in issue.

We are impressed by the part played by the modern clearing system on the commodity exchanges. It clears trades between brokers, adjusts money differences growing out of these cleared trades, controls margins between brokers and directs the making of deliveries. Yet we are satisfied that this vast mechanism and its handling of trades does not materially affect the matters here in issue. The relationship of pledgor-pledgee remains after the clearing process has done its work. The commodity contract does not lose its identity. It continues to evidence the actual commodity and the customer may still command delivery thereon.

In our case it does not appear that the margin deposits were earmarked, nor what became of the money. For aught that appears, the funds may have been spent for current operating expenses. It is clear that appellants have not complied with the tracing doctrine as regards the margin deposits.[5] However as to the profits accrued from the sale of the contracts the appellants have shown that the contracts in pledge were carried day after day until the bankruptcy, then turned over to the trustee in bankruptcy by the debtor pledgee, and soon thereafter ordered sold by the court. And of course upon the sale of the pledged property, the proceeds take the place of the property and may be reclaimed in lieu thereof. Thomas v. Taggart, 209 U.S. 385, 389, 28 S.Ct. 519, 52 L.Ed. 845.

In order to identify a share of corporate stock it is not necessary that any particular certificate be allocated by number to the claimant on the broker's books or that it be physically set aside for the customer. Richardson v. Shaw, 209 U.S. 365, 379, 28 S.Ct. 512, 52 L.Ed. 835, 14 Ann. Cas. 981; Gorman v. Littlefield, 229 U.S. 19, 25, 33 S.Ct. 690, 57 L.Ed. 1047; Duel v. Hollins, 241 U.S. 523, 527, 36 S.Ct. 615, 60 L.Ed. 1143. Claimants in the cases cited above met the burden of identification and tracing. Appellants here have done as much. It follows that they have successfully traced their property to the proceeds of the liquidation sale, unless there is merit to the argument by counsel for appellee.

We conclude that any bookkeeping offset of the Clearing House in determining the net position of the debtor does not have the effect claimed by counsel for appellee. Appellants have complied with the doctrine of tracing[6] and have traced their commodity contracts to the proceeds of the liquidation sale.

The order of the District Court is reversed and the case is remanded with directions to proceed in accordance with this opinion. It is so ordered.

---

sale of the contracts; a deposit of margins to the sum of $150.

[5] It is to be noted that at the time of the deposits in question there was no Commodity Exchange Act of 1936 which prohibits the mingling of margins. 7 U. S.C.A. § 6d.

[6] We have stated in the opinion that the same law applying to stock broker bankruptcies should apply to grain broker bankruptcies. The instant case arose prior to the Chandler Act, 11 U.S.C.A. § 96, sub. e (Supp.1938), so we must keep in mind that the analogous law applicable here is the law pertaining to stock broker bankruptcies prior to the Chandler Act. We state this because it appears that the Chandler Act has amended the prior law in many respects. For instance, it appears that the Chandler Act has altered the tracing doctrine so pertinent in the instant case and that it has made a clean cut distinction between customers and general creditors.