466 F.2d 1035
 SECURITIES AND EXCHANGE COMMISSION, Plaintiff,
v.
FIRST SECURITIES COMPANY OF CHICAGO, Defendant.
Union Bank & Trust Company, Helena, Montana, Claimant-Appellant,
Keith S. McKy, Receiver-Appellee, Customer Creditors
Committee, Committee-Appellee.
 No. 71-1422.
 United States Court of Appeals,
Seventh Circuit.
 Argued April 13, 1972.
Decided Aug. 1, 1972.
Certiorari Denied Dec. 4, 1972.
See 93 S.Ct. 528.
 
 Frank G. Uriell, Ellis A. Ballard, Robert C. Bonges, Pope, Ballard, Kennedy, Shepard & Fowle, Chicago, Ill., Attorneys for claimant-appellant.
 Samuel H. Young, John D. Cummins, Chicago, Ill., for committee-appellee.
 Charles Aaron, Michael L. Weissman, Chicago, Ill., Aaron, Aaron, Schimberg & Hess, Chicago, Ill., for receiver-appellee.
 John I. Mayer, Joseph L. Grant, S.E. C., Chicago, Ill., for S.E.C.
 Before HAMLEY,* STEVENS and SPRECHER, Circuit Judges.
 SPRECHER, Circuit Judge.
 
 
 1
 This is another sad chapter in the case of Leston B. Nay and the frauds he perpetrated over a long period of years against a great number of innocent investors. The record in this court in the prior appeal of 15 individual escrow participants, Olga Hochfelder et al., has been made part of the record in this appeal. SEC v. First Securities Co., 463 F.2d 981 (7 Cir. 1972).
 
 
 2
 The defendant in the equitable receivership, First Securities Company of Chicago, was registered with the Securities and Exchange Commission as a brokerdealer in securities and was a member of the Midwest Stock Exchange and the National Association of Securities Dealers. On June 4, 1968, Leston B. Nay, president of First Securities and owner of 92 percent of its stock, murdered his wife and committed suicide. He left a suicide note which described First Securities as bankrupt because of his thefts and which characterized the "Schueren account" as being one of "the thefts affecting the Company."
 
 
 3
 On June 10, 1968, the SEC initiated the receivership action against First Securities. The claim which is the subject matter of this appeal derives from Nay's theft of securities owned by Arnold C. Schueren. The district court appointed a special master to hear and determine the validity of the various claims against First Securities. In accordance with the recommendation and findings of the special master, the district court disallowed the instant claim on behalf of the estate of Arnold C. Schueren in its entirety, and this appeal followed.
 
 
 4
 * On April 16, 1936, Arnold C. Schueren appointed Nay "to act for me in connection with all matters arising out of or in any way connected with my securities to the same extent and with the same full power and authority as I might personally do if present." On July 7, 1937, "[w]ithout detracting from the general and specific powers contained in that instrument [of April 16, 1936], I further authorize and empower the said Leston B. Nay to sign in my behalf any proxies, transfers, acknowledgments, accounts, receipts or documents for my securities with the same power and authority as I would myself if present."
 
 
 5
 In July, 1939, Schueren received a letter headed "Webber, Darch & Company, Leston B. Nay, President" and signed Webber, Darch & Company "by Leston B. Nay." The letter stated, "In accordance with your recent request we are pleased to enclose inventory of securities held in safe keeping for your account;" an itemized inventory was enclosed.
 
 
 6
 Nay joined Ryan-Nichols & Co. as vice-president in 1942. Schueren received a letter dated July 31, 1942, on the letterhead of Ryan-Nichols & Co., signed Ryan-Nichols & Co. "by Leston B. Nay, Vice President." It said, "We have received from Webber, Darch & Co. the following securities, which we placed in safe keeping for your account;" following was an itemized list of securities. The name of Ryan-Nichols & Co. was changed to First Securities Company of Chicago on June 24, 1944, at about which time Nay became president and principal shareholder.
 
 
 7
 From 1946 through 1963, First Securities bought and sold securities for Schueren in bona fide transactions which appeared in the books and records of First Securities and which were not tainted by any defalcations of Nay. In connection with these transactions, Schueren received confirmations on the printed forms of First Securities.
 
 
 8
 For all his securities Schueren received safekeeping receipts. Those appearing in the record were on the printed forms of First Securities and acknowledged receipt by "First Securities Company of Chicago" and showing the typed names and written initials of Campbell, Burke and Walker.
 
 
 9
 Each month Schueren would receive an itemized list of dividends received on the securities purportedly in safekeeping for him, together with a cashier's check for the month's total dividends. Although a few of the dividend itemizations were on otherwise blank paper, the great majority were typed on the printed letterhead of First Securities with the further printed designation "Member, Midwest Stock Exchange."
 
 
 10
 Under date of March 17, 1959, Schueren received a complete inventory of his purported holdings, typed on the letterhead of First Securities. Schueren found three discrepancies between his own records of his holdings and those on the March 17 inventory list. He pointed them out to Nay, who wrote Schueren a letter dated March 26, 1959, on the printed letterhead of First Securities, acknowledging the three errors and ascribing them to the typist.
 
 
 11
 Schueren died in 1967; the Union Bank and Trust Company was appointed his executor. The bank then wrote Nay requesting all of Schueren's securities. On April 27, 1967, Nay sent the bank what purported to be a complete inventory of the Schueren holdings, typed on sheets stamped with the name of First Securities. For more than a year, Nay corresponded with the bank and pretended to be in the process of obtaining transfers of the Schueren securities. When on June 4, 1968, he finally told the bank that the security transfers had been completed and were ready for delivery, he committed suicide. Thereafter the bank learned of Nay's thefts of the securities involved in this claim, which were valued at $394.195.39.
 
 II
 
 12
 Because of the legal conclusions reached in the Hochfelder appeal, it is important to consider the factual basis from which they derived. This court said in SEC v. First Securities Co., 463 F.2d 981 at pages 983-985 (1972):
 
 
 13
 "The fifteen claimants had each been brokerage clients of First Securities, buying and selling securities through First Securities in regular fashion. Each received investment advice from Nay, and each knew Nay to be the president of First Securities. Nay advised each of the claimants that he was able to offer to the claimant an opportunity to invest in a so-called escrow which would yield a high rate of interest. . . . Typically, upon being persuaded by Nay that the escrow was the best possible investment for them, the claimants sold legitimate securities through First Securities for purposes of obtaining the necessary cash to invest in the escrow. First Securities effected the sales, collected its commissions and submitted the proceeds to the claimants, who then drew their personal checks payable to Nay or to a bank for his account. Subsequent transactions with regard to the escrow were not in the form usual to dealings between customers and First Securities, nor was the escrow reflected in periodic accountings by First Securities to the claimants.
 
 
 14
 "Upon receipt of the cash investment from the claimants Nay usually executed a handwritten document which acknowledged such receipt and confirmed the terms of the arrangement. Sometimes Nay gave promissory notes to the claimants. All, or substantially all, of Nay's correspondence with the claimants was written on letterhead stationery of First Securities. Some of the letterhead stationery included the words, 'Leston B. Nay, President,' on the upper left hand portion thereof. All of the stationery bore the legend, 'Member Midwest Stock Exchange,' in addition to the firm's name and address. Although much of Nay's correspondence with regard to the escrow transactions was handwritten by him, a substantial portion was typed by his secretary at First Securities.
 
 
 15
 "During the early years of Nay's fraudulent enterprise, the claimants were paid interest from time to time based upon their 'investments' in the escrow. Such payments were made by Nay's personal check. . . .
 
 
 16
 "Finally, it is clear that Nay had no actual authority to act for First Securities with regard to the escrow account. It is also clear that First Securities' employees (other than Nay) knew nothing of the nature of the escrow nor, except for his secretary, even of its existence. Nay had forbidden anyone other than himself to open mail addressed to him, and in his absence all such mail was simply allowed to pile up on his desk, even if it was addressed to First Securities for his attention."
 
 
 17
 On the basis of the above facts, this court concluded that (1) Nay acted with apparent authority as the common law agent of First Securities; (2) First Securities was a "controlling person" as to Nay within the intention of section 20(a) of the Securities Exchange Act of 1934, 15 U.S.C. Sec. 78t(a); (3) First Securities at least aided and abetted Nay in violating section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. Sec. 78j(b), and Rule 10b-5 promulgated pursuant thereto, 17 C.F.R. Sec. 240.10b-5; and (4) First Securities failed to satisfy its duty to supervise Nay pursuant to Rule 27 of the Rules of Fair Practice of the National Association of Securities Dealers, Inc. This court held that First Securities was liable for Nay's fraud to the 15 escrow participants on all four theories.
 
 III
 
 18
 The parties to this appeal, with a commendable willingness to disclose everything which has occurred in the equitable receivership, included in the record here the evidence relating to, and the disposition by the special master (approved by the district court) of two other pertinent claims.
 
 
 19
 Norman L. Moyer had appointed Nay executor of his will. When Moyer died on March 3, 1958, Nay as executor took custody of his stocks and bonds. In his final account filed in the probate court, Nay recited that the securities had been distributed to the widow, Nora A. Moyer; actually Nay had delivered to her a safekeeping receipt with a First Securities stamp thereon. The securities never appeared in the records of First Securities and were missing at the time Nay took his life. In recommending allowance of the Moyer claim, the special master concluded:
 
 
 20
 "The question . . . is whether the transactions purported to have been carried out, on the broker's side, by Mr. Nay individually or by him on behalf of First Securities. And to this question there is a clear answer: The receipt which was signed in the name of First Securities and which contained a First Securities stamp at the top of each page, and the quarterly statements furnished to Mrs. Moyer as an accounting of dividends and interest received, clearly purported to be documents of First Securities. No question is raised as to Mr. Nay's authority to act as agent and validly sign for First Securities. And Mr. Nay, in his death note, listed the Moyer theft as 'affecting the Company'.
 
 
 21
 "Furthermore, even if the matter is looked at from the point of view of Mrs. Moyer's intentions, there are indications that Mrs. Moyer relied on First Securities so far as the safekeeping of the securities was concerned. . . ."
 
 
 22
 A second claim recommended for allowance by the special master and allowed by the district court was that of Arnold C. Schueren's wife, Eleanore A. Schueren, whose relation to Nay and First Securities was similar to that of her husband except that she had signed no power of attorney.
 
 
 23
 In allowing the claim of Mrs. Schueren, the district court concluded:
 
 
 24
 "Mrs. Schueren's dealings with Nay were similar to those of Nora A. Moyer, whose claim has previously been allowed by the court. Mrs. Schueren received documents purporting to be safekeeping receipts and monthly statements of her account, all on First Securities forms or letterheads. Thus, the preponderance of the evidence establishes that Nay had apparent authority to deal with Mrs. Schueren as the agent of First Securities, and that Mrs. Schueren intended to deal with him in that capacity. I agree with the Special Master's view that the fact that payments were made by cashier's check is not sufficient to negate Nay's apparent authority, or to raise such suspicion as to cause a person using due diligence to discover that Nay did not have actual authority to act for First Securities in those transactions."
 
 IV
 
 25
 Consideration of the facts leading this court to conclude that the claims of the 15 escrow participants against First Securities should be allowed and of the facts leading the special master and the district court to allow the Moyer and Eleanore Schueren claims, causes us to conclude that the Schueren claim should also be allowed despite the existence of the power of attorney.
 
 
 26
 The power of attorney was executed by Schueren in 1936 and supplemented in 1937. The power and supplement were typewritten forms in which Schueren's name was inserted in handwriting. There is nothing in the voluminous record before us to indicate that Schueren was ever again reminded of the existence of the power of attorney after 1937.
 
 
 27
 The only evidence in the record which reflects Schueren's intention and understanding is a memorandum dated May 31, 1957, addressed to the Union Bank & Trust Company, in which he refers to the location of the safekeeping receipts:
 
 
 28
 "All of our securities, with the exception of a few common stocks are held in Safe keeping by the First Securities Company, 134 South LaSalle Street, Chicago, 3, Ill. Mr. Leston B. Nay is President of this Company."
 
 
 29
 Like the escrow participants, Schueren was a bona fide customer of First Securities quite aside from the tainted Nay transactions. First Securities bought and sold securities for him, he issued his checks payable to First Securities, he received valid confirmations and other documents from First Securities and the books and records of the company reflected these untainted transactions.
 
 
 30
 What after Nay's death proved to be scores of spurious safekeeping receipts and spurious monthly dividend statements and the spurious inventories in 1959 and 1967 were on the genuine letterheads and forms of First Securities, were apparently in proper order, were often signed by Nay who had "authority to act as agent and validly sign for First Securities," or with the names and initials of persons who were or seemed to be actual officers or employees of First Securities (Campbell, Walker, Burke). Schueren himself kept meticulous books and records. Nothing which occurred during the almost 25 years of Schueren's dealings with First Securities and Nay can be said to have put a reasonable person on notice that anything was amiss. Nay's manipulations of the fraudulent records which were sent to Schueren at least monthly coincided with Schueren's own records of what he believed he owned. Even the trust department of the Union Bank was completely duped by Nay for more than a year after Schueren's death until Nay's suicide.
 
 
 31
 Nay believed that in his dealings with Schueren he was acting as the agent for First Securities. In his suicide note he said, "The thefts affecting the Company are 1) The Schueren acc't. (Union Bank of Helena . . .) 2) Moyer acc't." He gave detailed instructions to Roy Campbell, the cashier of First Securities, as to where the Schueren files and papers were located.
 
 
 32
 There is no evidence that anyone at First Securities other than Nay was ever aware of the 1936-37 Schueren power of attorney. There is no evidence that the power was ever used by Nay. Although it may be speculated that it was used, the facts are that Nay was able to dispose of the Moyer and Eleanore Schueren securities without using or even possessing a power of attorney from them.
 
 
 33
 As we stated in the prior appeal (page 988):
 
 
 34
 "Here, First Securities made Nay its president, provided him with the trappings of a successful investment counsellor, held him out as providing such counsel, and then wilfully allowed Nay's enforcement of a rule regarding the opening of mail which was antithetical to the prevention of frauds of the type which occurred."
 
 
 35
 First Securities also provided Nay with the printed letterheads, printed safekeeping receipts, rubber stamps and other supplies and accoutrements which enabled him to perpetrate and perpetuate his frauds.
 
 
 36
 For the four reasons upon which this court allowed the escrow claims in the prior appeal, we conclude that this claim should also have been allowed.
 
 
 37
 The judgment of the district court is reversed.[1]
 
 
 
 *
 Circuit Judge Frederick G. Hamley of the United States Court of Appeals for the Ninth Circuit is sitting by designation
 
 
 [1]
 The only case relied upon by the special master and the district court to reach a contrary conclusion, Rosen v.Harde, 238 App.Div. 622, 265 N.Y.S. 154 (1933), was decided by an intermediate state appellate court prior to the enactment of the Securities Exchange Act of 1934, was not concerned with the unique facts present here and apparently has never been cited since its issuance some 40 years ago