**SECURITIES AND EXCHANGE COM-
MISSION, Plaintiff,**

v.

**FIRST SECURITIES COMPANY OF
CHICAGO, Defendant.**

No. 68 C 1053.

United States District Court,
N. D. Illinois, E. D.

Sept. 5, 1973.

See also, 7 Cir., 466 F.2d 1035.

John I. Mayer, Regional Administrator, S.E.C., and Dennis J. Waldeck, Chicago, Ill., for plaintiff.

Charles Aaron and Michael L. Weissman, Chicago, Ill., for Keith B. McKy, Receiver.

Willard L. King, King, Robin, Gale & Pillinger, Willard J. Lassers, Elson, Lassers & Wolff, and Donald L. Vetter, Chicago, Ill., for escrow claimants.

Frank G. Uriell, Pope, Ballard, Kennedy, Shepard & Fowle, Chicago, Ill., for Union Bank & Trust Co. of Helena, Mont., and Eleanore A. Schueren, claimants.

John D. Norcross, Chicago, Ill., for Nora Moyer, claimant.

Samuel H. Young, Chicago, Ill., for Customer Creditors Committee.

Milton H. Cohen, Schiff, Hardin, Waite, Dorschel & Britton, Chicago, Ill., for Midwest Stock Exchange.

Joseph N. Morency, Jr., Price, Cushman, Keck & Mahin, Chicago, Ill., for Midwest Stock Exchange Special Trust Fund.

## MEMORANDUM OF DECISION AND ORDER

JULIUS J. HOFFMAN, Senior District Judge.

Exceptions have been taken to the Special Master's Report of April 5, and Supplemental Report of May 30, 1973. The exceptions raise issues concerning the following matters:

### I. *Means of Classification*

■ Transcending all matters is selection of a means for classifying the assets of and claims against First Securities Company of Chicago, the estate in receivership. The issue posed is whether Section 60(e) of the Bankruptcy Act [11 U.S.C. § 96(e)] would serve as an equitable means for such classification. With the exception of the Escrow Claimants, all parties who have addressed the issue agree that Section 60(e) should be applied, by analogy, to this proceeding. The Special Master has likewise urged the Court to utilize this section as a vehicle for classification.

Although the proponents of the application of Section 60(e) acknowledge that this is a case of first impression, they seek to bolster their proposal by suggesting that the case of In re Rosenbaum Grain Corporation, 112 F.2d 315 (7th Cir. 1940), serves as authority for such an application. They assert that this case established the broad principle that Section 60(e) may be applied, by analogy, to situations in which this section is not, *per se*, applicable.

In the *Rosenbaum* case, the debtor, a commodity futures broker, filed a voluntary petition for corporate reorganization under Section 77B of the Bankruptcy Act, 11 U.S.C. § 207. The claimants, marginal grain customers of the broker, filed priority claims against the estate. The District Court denied priority to the claimants for the reason that they had not sufficiently complied with the requirement of tracing their property into the hands of the trustee in bankruptcy. The 7th Circuit Court of Appeals reversed and remanded, concluding that since the relationship of a commodity futures broker and his customer was analogous to that of a stockbroker and his customer, the claimants, in fact, had successfully traced their property to the assets in bankruptcy.

In asserting that the *Rosenbaum* case established this broad principle, the Securities and Exchange Commission and the Receiver rely upon *obiter dictum* contained in footnote 6 of the opinion (112 F.2d at 319), which reads as follows:

> We have stated in the opinion that the same law applying to stock broker [sic] bankruptcies should apply to grain broker bankruptcies. The instant case arose prior to the Chandler Act, 11 U.S.C.A. § 96, sub. e (Supp. 1938), so we must keep in mind that the analogous law applicable here is the law pertaining to stock broker bankruptcies prior to the Chandler Act. . . .

However, prior to the Chandler Act, courts differed as to the applicable law. Some applied the "Massachusetts rule," which premised recovery upon the debtor-or-creditor relationship. Others applied the "New York rule," which was grounded on the pledgor-pledgee relationship and required tracing.[1] There-

---

1. By the so-called Massachusetts rule, the broker in margin transactions was regarded as the owner of the security purchased on margin and, in general, his title thereto passed to the trustee. The Massachusetts courts looked upon the broker as carrying the stock on an executory contract to purchase or sell, and held that the relationship between the broker and his customer was that of debtor and creditor.

Under the New York rule, the broker, in purchasing and selling, was regarded as the agent of the customer. In margin transactions, he became a pledgee as well. The customer was regarded as the owner of the shares if he could identify them as his own, whether they had been delivered for safekeeping and segregated, delivered to the broker as margin, or purchased by the broker for the customer's account and held in pledge. In order to reclaim his securities from the broker's trustee in bankruptcy, the customer had to be able to trace them.

fore, prior to the Chandler Act, the rights of customers of insolvent stockbrokers in receivership were determined by these common law rules. This District, that is to say, the U.S. District Court for the Northern District of Illinois, has followed the New York rule.

The Escrow Claimants have taken exception to the Special Master's recommendation that Section 60(e) of the Bankruptcy Act be applied, by analogy, to classify the assets and claims in this receivership. They argue that receivership proceedings are controlled by principles of equity; equity requires equality; Section 60(e) establishes priorities; therefore, the application of Section 60(e) would create inequality. The Escrow Claimants rely on the Report of Special Study of Securities Markets of the Securities and Exchange Commission [H.R.Doc.No.95, 88th Cong., 1st Sess. (1963)], which declares, "Section 60(e) does not apply to receiverships." However, the study goes on to say that:

. . . [w]hen liquidation is accomplished in this manner [i. e. through receivership proceedings] it appears that the old Massachusetts and New York doctrines may still have vitality and the capriciousness of result which Section 60(e) was designed to eliminate may prevail. Part 1, Ch. III, at 413.

The Report then recommended that Section 60(e) be amended to empower the Commission to petition to have an insolvent broker-dealer adjudicated a bankrupt. Thereafter, Congress enacted the "Securities Investor Protection Act of 1970" (15 U.S.C. §§ 78aaa et seq.), which creates a comprehensive plan for the protection of investors whose broker-dealers are in financial trouble. The liquidation proceeding in this plan is patterned after Section 60(e) of the Bankruptcy Act, but the shortcomings of Section 60(e) have been eliminated. See Report of Special Study of Securities Markets of the Securities and Exchange Commission, *supra,* pp. 410 et seq.; also, 3 U.S. Code Congressional and Adminis-

trative News, p. 5274, 91st Cong., 2nd Sess. (1970).

This is a receivership proceeding. It is conducted under the equity jurisdiction of the District Court. In certain circumstances, "equity follows the law."

In a broad sense, [this] maxim means that equity follows the law to the extent of obeying it and conforming to its general rules and policies . . . where no countervailing equity requires different treatment . . . . The maxim is strictly applicable whenever the rights of the parties are clearly defined and established by law, especially . . . by statutory provisions. 30 C.J.S. Equity § 103, at 1066–1068.

In selecting a means of classification, this Court must choose between an extensively-criticized common law rule [see, *e. g.,* 3 Colliers ¶ 60.71, at 1158, n. 3 (14th ed. 1964)], and a statutory provision designed to eliminate the "capriciousness" of that rule. It selects the latter, 11 U.S.C. § 96(e).

II. *Priority of Escrow Claimants*

The two decisions by the 7th Circuit Court of Appeals have made it very clear that First Securities is liable for Nay's fraud. See 463 F.2d 981 (7th Cir. 1972), cert. denied, McKy v. Hochfelder, 409 U.S. 880, 93 S.Ct. 85, 34 L.Ed.2d 134 (1972); 466 F.2d 1035 (7th Cir. 1972), cert. denied, McKy v. Union Bank & Trust of Helena, Mont., 409 U.S. 1041, 93 S.Ct. 528, 34 L.Ed.2d 491 (1972). The issue here is what priority shall the Escrow Claimants have under Section 60(e). The Section provides that:

. . . "customers" of a stockbroker shall include persons who have claims on account of securities received, acquired, or held by the stockbroker from or for the account of such persons (a) for safekeeping, or (b) with a view to sale, or (c) to cover consummated sales, or (d) pursuant to purchases, or (e) as collateral security, or (f) by way of loans of securities by such persons to the stockbro-

ker, and shall include persons who have claims against the stockbroker arising out of sales or conversions of such securities . . . . 11 U.S.C. § 96(e)(1).

The recommendation of the Special Master is that the Escrow Claimants not be deemed customers because their claims did not arise "on account of securities received, acquired, or held" by the stockbrokerage firm. The brokerage firm received no securities for the account of the Claimants; instead, all the escrow transactions were between the Claimants and Nay individually.

██ The term "customer" must be construed in light of the purpose of Section 60(e), not upon the principles upon which liability is based. The intent of the draftsmen of the Chandler Act was to give uniformity to the rules applicable to the liquidation of assets of bankrupt stockbrokers and to secure equality in distribution to margin customers. The Act bestows upon customers, as defined, a priority over other creditors; that is, all of the securities involved in the stockbroker's transactions with customers are to constitute a single fund. The creation of a "Single and Separate Fund" was based upon Congressional acceptance of the custom of security houses of putting all securities into a "common pot." Thus, having been a participant in that common pot appears to be determinative of "customer" classification. See McLaughlin, Aspects of the Chandler Bill to Amend the Bankruptcy Act, 4 U.Chi.L.Rev. 369, 395–398 (1937); Hearings on Revision of the Bankruptcy Act Before the Committee on the Judiciary, House of Representatives, 75th Cong., 1st Sess. (1937).

It is undisputed that the Escrow Claimants sold securities through their accounts at First Securities, and that the proceeds were placed in Nay's hands for investment purposes. However, these proceeds were transmitted by the Claimants, through their respective, personal checking accounts, to Nay, individually. Thus, as to the Escrow Claim-

ants, a transition from "customer" to private investor had clearly occurred. Subsequent dealings between the Escrow Claimants and Nay further expose the personal nature of these transactions. For example:

(1) First Securities did not reflect the transactions in its periodic accountings to customers;

(2) Interest was paid on the escrow investments through Nay's personal checking account;

(3) For income tax purposes, Nay sent Treasury Form 1099 to each of the Claimants, which indicates that distributions of interest to them had been reported as deductions on Nay's personal income tax returns;

(4) Letters of verification of indebtedness had been signed by the Claimants for purposes of Nay's internal revenue audits; and

(5) Correspondence between Nay and some of the Claimants refer to the escrow as a personal loan; in some instances, the personal obligations were evidenced by promissory notes.

Consequently, a clear distinction exists between "customers" of First Securities and the Escrow Claimants. Relative to the escrow transactions, no securities were held on account by the stockbrokerage firm, nor were any received from the Escrow Claimants. The transactions were not even acknowledged by First Securities. In short, the sum total of the evidence leads the Court to the inescapable conclusion that the transactions between Nay and the Escrow Claimants were personal in nature.

██ The objective of the Chandler Act was to put all the customers whose money had gone into the security account on an equal footing. The Escrow Claimants were not participants in that common security account; hence, they are not "customers" within the meaning of Section 60(e) [11 U.S.C. § 96(e)].

III. *Allocation of Assets Pursuant to Section 60(e)*

The Escrow Claimants assert that the Receiver's allocation of assets, as reviewed by the Special Master in his Supplemental Report filed May 30, 1973, is unsupported by Section 60(e), and that preferences have been granted in the absence of a hearing. Principally, the Claimants urge that the Receiver has "misapprehended the command of [Section] 60(e)(2)" [11 U.S.C. § 96(e)(2)], which provides, in pertinent part:

> All property at any time received, acquired, or held by a stockbroker from or for the account of customers, except . . . the proceeds of all customers' property rightfully transferred or unlawfully converted by the stockbroker, shall constitute a single and separate fund; and . . . [these] customers . . . shall constitute a single and separate class of creditors, entitled to share ratably in such fund on the basis of their respective net equities as of the date of bankruptcy . . ..

■ The Escrow Claimants interpret this section as prescribing that the source of the property identified, not the manner of its ultimate disbursement, is determinative of its allocation. The Receiver maintains that after "exhaustive and meticulous examination of the records" and accounts of the estate, the assets were divided between the Single and Separate Fund and the General Fund in accordance with Section 60(e); that is, the terms of that section require allocation of assets to the Single and Separate Fund on the basis of property "received from customers" and property held "for the account of customers." The Court adopts the latter interpretation.

■ The Escrow Claimants next assert that the claims of banks, brokers, and mutual funds (totaling $176,468) should be charged against the General Fund. On the other hand, the Receiver justifies the classification of these claimants as "customers" on the basis of privity of contract between brokers on purchase and sale agreements. Clearly, banks and similar institutions fall within the "customer" classification as defined by Section 60(e).

With regard to the hearing held on May 21, 1973, the Court adopts the Special Master's recommendation to allocate the checks, there in question, to the Single and Separate Fund. The Escrow Claimants take exception on the ground that legitimate claims had not been filed. The Special Master concluded that the claims on file were legitimate with certain minor exceptions, including Check No. 33375 which was drawn to the order of Value Line Securities, Inc. in the amount of $1,895.20. As to this check, the Special Master has directed the Receiver to investigate further whether or not a claim was filed.

The checks, in the total amount of $359,624, that were issued to customers by First Securities but not honored because of the intervention of the receivership, have been properly allocated to the Single and Separate Fund.

■ The Escrow Claimants assert that the sum of $51,894, representing a check issued by the Continental Illinois National Bank and Trust Company of Chicago and cleared for the purpose of purchasing 580 shares of General Electric stock, should be allocated to the General Fund. The stock was never delivered because of the interposition of the receivership. A court order was issued rescinding the transaction. Thus, the Continental Bank was properly designated a "customer," and thus the cash has been properly allocated to the Single and Separate Fund.

It is further asserted that the sum of $47,870, representing profits and commissions on transactions, and turned over to the Receiver by other brokers, should be allocated to the General Fund. As for this cash amount, the Court adopts the allocation that has been recommended by the Special Master.

■ The Escrow Claimants next assert that dividends earned on securities

which are allocated to the Single and Separate Fund must be applied to the General Fund. However, it must be recognized that the accrual of interest and/or dividends on securities that have been allocated to a particular fund properly accrue to that fund.

Finally, the Escrow Claimants assert that all interest earned on Treasury Bills should be allocated *in toto* to the General Fund. The Receiver allocated the earned interest between the General Fund and the Single and Separate Fund in proportion to their respective percentages of the total assets of the receivership estate. The Court will adopt the procedure followed by the Receiver. The entire estate was invested in United States Treasury Bills; therefore, equity demands an allocation according to the source of these funds.

## IV. *Usury as a Defense*

The Special Master has recommended that the interest received by the Escrow Claimants be forfeited as usurious. The Master found that interest payments paid by Nay ranged from 9% to 12% per annum; that what are now characterized as "loans" (presently the Escrow Claims) were not made to a corporation, but were made to Nay individually. The legal rate of interest at the time of these so-called loans was 7% per annum. Ill.Rev.Stat. ch. 74, § 4 (1967).

Thus, two issues are raised: (1) Did the escrow transactions have sufficient vestiges of *bona fide* investments; and (2) Could the First Securities Company of Chicago raise, what will be termed, Nay's usury defense.

First, Nay induced the Escrow Claimants to invest, representing that their moneys would be used by a small corporation as principal to make loans, making it possible for the investors to realize a high rate of interest. Nay was to act as a conduit for the transfer of funds to the finance company. The interest was to be paid by that company, not Nay. Whether a transaction is usurious is dependent upon the facts, circumstances, and intent of the parties. Chicago Title & Trust Company v. Kearney, 282 Ill.App. 279, 286 (1935); 91 C.J.S. Usury § 11, at 579–583. Nay received the moneys of the Escrow Claimants for the stated purpose of investing so as to receive a high yield return, not to evade the usury laws. This was a purported investment with the necessary risks of investment, that is, loss of the principal sum. The rule of law is well settled that when the payee takes a risk by which he runs the hazard of losing the principal sum or of receiving less than the sum originally due, it is not usurious for him to stipulate for or receive more interest than is prescribed by statute. Stevenson v. Unkefer, 14 Ill. 103 (1852). Furthermore, for use as a defense, usury must be definitely proven. Wilson v. Kirby, 88 Ill. 566 (1878); Mosier v. Norton, 83 Ill. 519 (1876); Stanley v. Chicago Trust & Savings Bank, 165 Ill. 295, 46 N.E. 273 (1896); Home Building & Loan Association v. McKay, 217 Ill. 551, 75 N.E. 569 (1905); Simon v. South End Cleaners & Dyers, 246 Ill.App. 14 (1927). Here, the Court finds that usury was not proven.

Assuming, *arguendo*, usury was proven, First Securities still could not avail itself of this defense. The general rule is that the defense of usury is for the benefit of the borrower and is personal as to him. 91 C.J.S. Usury § 71, at 648; 55 Am.Jur. Usury § 121, at 409. The courts of the State of Illinois have long recognized the personal nature of the right to set up this defense. See, *e. g.*, Maher v. Lanfrom, 86 Ill. 513 (1877). As stated in 91 C.J.S., *supra*:

Since usury laws are enacted for the protection of needy borrowers, and not to punish extortion in money lenders, the defense is purely personal to the borrower, or those in privity with him, . .. . such as the debtor's sureties, guarantors, heirs, devisees, and personal representatives. This is true whether the statutes declare the contract void in whole or only to the extent of the usury, or whether a pen-

**374**

alty is given for the taking. In order to question the validity of a usurious contract, the right must be based on the original debtor's right.

The 7th Circuit Court of Appeals has held that First Securities is liable for the conduct of its agent and for its own failure to comply with the Securities Act. See 463 F.2d 981 (7th Cir. 1972), cert. denied, McKy v. Hochfelder, 409 U.S. 880, 93 S.Ct. 85, 34 L.Ed.2d 134 (1972); 466 F.2d 1035 (7th Cir. 1972), cert. denied, McKy v. Union Bank & Trust of Helena, Mont., 409 U.S. 1041, 93 S.Ct. 528, 34 L.Ed.2d 491 (1972). However, this does not put First Securities "in the shoes" or position of Nay. Although there is authority to indicate that usury laws may serve to protect creditors when insolvency or bankruptcy intervenes [see, e. g., 11 U.S.C. § 107(d)(6); Broude, Toward a New Fraudulent Conveyance: The Trustee in Bankruptcy and the Usurious Lender, 63 Nw.U.L.Rev. 331 (1968)], the burden has not been met in the instant case.

Therefore, having considered the findings and recommendations of the Special Master and the exceptions taken thereto, and having considered all the memoranda of the parties,

It is hereby ordered:

(1) That the Receiver shall classify the assets of and claims against the estate of First Securities Company of Chicago in accordance with the provisions of Section 60(e) of the Bankruptcy Act, 11 U.S.C. § 96(e); and

(2) That the Escrow Claimants, Olga Hochfelder, et al., be designated "General Creditors" of the estate of First Securities Company of Chicago.

Further,

(3) The allocation of assets as set forth by the Special Master in his Supplemental Report filed May 30, 1973, is in all respects approved and confirmed.

(4) The Court declines to adopt the recommendation of the Special Master that the interest payments received by the Escrow Claimants, Olga Hochfelder, et al., should be regarded as forfeited by reason of their being usurious; the Court therefore orders that the amounts of such interest payments shall not be deducted from the Escrow Claims.

It is further ordered that the foregoing shall be and is a final judgment under Rule 54(b) of the Federal Rules of Civil Procedure with respect to these matters, there being no just reason for delay.