SECURITIES AND EXCHANGE COM-
MISSION, Plaintiff-Appellee,

v.

FIRST SECURITIES COMPANY OF CHI-
CAGO, a corporation, Defendant-
Appellee,

Leon N. Carnovsky et al., "Escrow Claim-
ants"-Appellants, (In 73–2026), "Escrow
Claimants"-Appellees, (In 73–2027),

Customer Creditors Committee, Commit-
tee-Appellees, (In 73–2026), Commit-
tee-Appellants, (In 73–2027),

Keith B. Mc Ky, Receiver-Appellee.

Nos. 73–2026 and 73–2027.

United States Court of Appeals,
Seventh Circuit.

Argued Sept. 16, 1974.

Decided Nov. 22, 1974.

Michael L. Weissman and Charles Aaron, Samuel H. Young, Chicago, Ill., for Customer Creditors Committee.

Willard J. Lassers and Alex Elson, Donald L. Vetter, Chicago, Ill., for Carnovsky.

Before FAIRCHILD, CUMMINGS and PELL, Circuit Judges.

FAIRCHILD, Circuit Judge.

On June 4, 1968 Leston B. Nay, President of First Securities Company of Chicago, committed suicide. In a note he described certain spurious escrow accounts which he had created and he confessed thefts which in his view rendered First Securities bankrupt. Within a week, the Securities and Exchange Commission commenced this receivership action against First Securities. In two prior appeals we resolved questions concerning the allowance of claims against the receivership estate, Securities & Exch. Com'n v. First Securities Co. of Chicago, 463 F.2d 981 (7th Cir. 1972), cert. denied, 409 U.S. 880, 93 S.Ct. 85, 34 L.Ed.2d 134 (the *Hochfelder* appeal), and Securities & Exch. Com'n v. First Securities Co. of Chicago, 466 F.2d 1035 (7th Cir. 1972), cert. denied, 409 U.S. 1041, 93 S.Ct. 528, 34 L.Ed.2d 491 (the *Schueren* (Union Bank) appeal). Since these decisions fully recount the details of the frauds, we will only refer to the facts that are pertinent to the issues now before us.[1]

The present appeals are from an order of the district court that classified First Securities' assets and the claims against them in anticipation of the firm's liquidation. The matter was first heard before a special master who filed a report with the district court. The report recommended: (1) that, although not directly applicable, section 60(e) of the Bankruptcy Act, 11 U.S.C. § 96(e) (applicable to a bankrupt stockbroker), would provide an equitable means for the classification and distribution of First Securities' assets; (2) that the court accept with minor changes the receiver's classification of assets pursuant to section 60(e); (3) that the participants in Nay's spurious escrow account should not be considered "customers" as that term is defined in section 60(e); and (4) that certain "interest" payments received by the escrow participants from Nay be forfeited as usurious and deducted from their claims against First Securities. The district court approved and adopted the special master's report with the exception of his recommendation that Nay's interest payments to the escrow participants be deducted.[2] A group designated the escrow claimants, including six of the escrow investors, appeals in No. 73–2026, taking exception to the district court's rulings on the application of section 60(e) and their status under the proposed plan of distribution. In No. 73–2027, the Customer Creditors Committee, a group representing a number of First Securities' customers, appeals from the district court's determination that the escrow participants' interest payments should not be forfeited.

I

All the parties except the escrow claimants agree that the principles of section 60(e) of the Bankruptcy Act

---

1. For related litigation see, Hochfelder v. Midwest Stock Exchange, 503 F.2d 364 (7th Cir. 1974) and Hochfelder v. Ernst & Ernst, 503 F.2d 1100 (7th Cir. 1974).

2. Securities & Exch. Com'n v. First Securities Co. of Chicago, 366 F.Supp. 367 (N.D. Ill.1973).

should govern the distribution of assets in this receivership. Section 60(e) provides for the creation of a single and separate fund (Separate Fund) to which those creditors who are deemed customers under the statute have prior resort for satisfaction of their claims against the bankrupt. The application of section 60(e) coupled with the district court's holding that the escrow claimants are not customers within the meaning of the statute relegates the escrow claimants to the status of general creditors and considerably reduces the amount by which their claims will be satisfied.[3]

The escrow claimants argue that equality is equity and that it is unsound to apply a provision of the Bankruptcy Act to liquidation in an equity receivership. Their argument gives no recognition to the fact that a considerable portion of the assets on hand represents cash or the proceeds of securities entrusted to First Securities by customers for purposes incidental to the ordinary course of the business of First Securities, and that the same reasons for the section 60(e) treatment exist in the instant stockbroker liquidation as Congress must have considered in choosing to provide specially for stockbroker bankruptcies.

■ Section 60(e) was enacted to provide a standard for determining the rights of brokerage house customers in a bankruptcy proceeding. House Report No. 1409 on H.R. 8046, 75th Cong., 1st Sess. (1937) 31. The statute was intended to protect, and secure equality of treatment for, "the public customer who has entrusted securities to a broker for some purpose connected with participa-

tion in the securities markets." SEC v. F. O. Baroff Co., Inc., 497 F.2d 280, 283 (2d Cir. 1974). We are aware of no difference in purpose or principle which would militate against resorting to section 60(e) for a formula for an equitable solution of the similar conflicts in interest in this receivership liquidation.

■ One objective of the framers of section 60(e) was to eliminate, in bankruptcy proceedings, previous conflict in rules and create rules which would be uniform throughout the nation. Tepper v. Chichester, 285 F.2d 309, 311 (9th Cir. 1960). Congress recently furthered the interest in uniformity of treatment of insolvent brokerage houses in the enactment of the Securities Investor Protection Act of 1970, (SIPA), 15 U.S.C. § 78aaa et seq., which adopts to a large degree the provisions of section 60(e) and makes them applicable to any brokerage house liquidation proceeding under SIPA.[4] House Report No. 91–1613, 91st Cong., 2d Sess. (1970), 3 U.S.Code Congressional and Administrative News, 91st Cong., 2d Sess. (1970) 5262–5264. Although SIPA has no retroactive application, Lohf v. Casey, 466 F.2d 618 (10th Cir. 1972), its enactment supports the reasonableness of the district court's selection of the section 60(e) formula to govern the instant liquidation.

II

■ Next, the escrow claimants argue that if section 60(e) is applied, they should be considered "customers" and eligible to participate in the Separate Fund. They contend that to hold otherwise would be inconsistent with this court's prior decisions in this litigation.

---

3. In their brief the escrow claimants suggest the magnitude of their loss when section 60(e) is applied:
    "Under the distribution plan mandated by the District Court, all other claimants will receive 54% of their claims; while the escrow claimants will receive less than 15%. Under a pro rata distribution, [as proposed by the escrow claimants] all claimants, including the escrow claimants, would receive about 37%."

4. "The definition [of customer] in the Bankruptcy Act and SIPA sections is in identical language. Under each law, the preferential protection is accorded to a person who can trace and identify the trust property or funds in the hands of the stockbroker; other claimants must look to the general assets of the stockbroker for satisfaction." Securities and Exchange Com'n v. Kenneth Bove & Co., Inc., 378 F.Supp. 697, 700 (S.D.N.Y 1974).

The liability of First Securities to the escrow claimants was determined in the *Hochfelder* appeal. 463 F.2d 981 (7th Cir. 1972), cert. denied, 409 U.S. 880, 93 S.Ct. 85, 34 L.Ed.2d 134. Leston Nay had induced the escrow claimants, who had each been regular brokerage clients at First Securities, to sell their legitimate securities and invest in an escrow account which Nay touted as a lucrative investment opportunity. Relying upon his advice, claimants made payments into the escrow fund. They did this by personal checks payable to Nay or a bank for his account. The transactions were clearly "not in the form usual to dealings between customers and First Securities, nor was the escrow reflected in periodic accountings by First Securities to the claimants." 463 F.2d at 984. When the nonexistence of the escrow became known on Nay's death, the escrow investors filed claims against the assets of First Securities. Reversing the district court's denial of their claims, we held that First Securities was liable to the escrow participants on the grounds that Nay had acted with apparent authority for First Securities, that First Securities was a "controlling person" within section 20(a) of the Securities Exchange Act of 1934, 15 U.S.C. § 78t(a), that First Securities aided and abetted Nay in violating section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b) and SEC Rule 10b–5, and that First Securities inadequately supervised Nay as required by Rule 27 of the Rules of Fair Practice of the National Association of Securities Dealers, Inc.

In the *Schueren* appeal we held that First Securities was liable for Nay's thefts from an investor's account even though the investor had exercised a power of attorney in favor of Nay. 466 F. 2d 1035 (7th Cir. 1972), cert. denied, 409 U.S. 1041, 93 S.Ct. 528, 34 L.Ed.2d 491. The reasons supporting this liability were the same as for the escrow claimants. In the course of our opinion we noted: "Like the escrow participants, Schueren was a *bona fide* customer of First Securities quite aside from the tainted Nay transactions." 466 F.2d at 1039 (emphasis in the original).

The escrow claimants argue that it logically follows from both the holdings of the cases and the language of the opinions that they are "customers" of First Securities and entitled to share in the section 60(e) Separate Fund. We disagree. Our prior decisions established liability of First Securities to the escrow claimants on account of Nay's fraudulent activity. They by no means held or implied that the funds entrusted to Nay for deposit in "escrow" were property entrusted to First Securities for the types of purpose dealt with by section 60(e). Although the district court and we have analytically separated the question of whether to follow section 60(e) in this receivership from the question of whether the escrow claimants are to be treated as "customers," we may be deciding, in reality, only the single proposition that, given all the facts of the matter, it is equitable to accord a prior claim on the type of assets in the Separate Fund to those who turned their assets over to First Securities in the ordinary course of business.

Section 60(e) provides:

"[C]ustomers" of a stockbroker shall include persons who have claims on account of securities received, acquired, or held by the stockbroker from or for the account of such persons (a) for safekeeping, or (b) with a view to sale, or (c) to cover consummated sales, or (d) pursuant to purchases, or (e) as collateral security, or (f) by way of loans of securities by such persons to the stockbroker, and shall include persons who have claims against the stockbroker arising out of sales or conversions of such securities; . . . .

The escrow claimants do not fall within a literal reading of this definition. The district court found that "[r]elative to the escrow transactions, no securities were held on account by the stockbrokerage firm, nor were any received from the Escrow Claimants."

Even if the definition of customers be read so as to include persons who have claims on account of funds deposited for investment, the transactions involved were on their face directly with Nay, personally, and were neither in fact nor understood to be a deposit of funds with First Securities.

The escrow claimants argue, however, that it is inequitable to exclude them from participation in the Separate Fund when others whose property was not among the firm's assets are allowed to satisfy their claims against the fund. Specifically, they note that even though Mrs. Moyer's securities and the Schuerens' property were missing as a result of Nay's embezzlement, these victims of Nay's fraud were found to be customers under section 60(e). Unlike the escrow claimants, however, the Schuerens and Mrs. Moyer received safekeeping receipts under First Securities' stamp and regular statements under the firm's letterhead. 466 F.2d at 1036–1039. The escrow claimants, on the other hand, dealt personally with Nay. In short, the Schuerens and Mrs. Moyer, like other customers, relied on First Securities to hold their property while the escrow claimants relied upon Nay. Thus, the former may be classified as customers because in the language of section 60(e) they are "persons who have claims against the stockbroker arising out of sales or conversions of such securities. . . ." *Cf.* Securities and Exchange Com'n v. S. J. Salmon & Co., Inc., 375 F.Supp. 867 (S.D.N.Y.1974).

### III

The escrow claimants also challenge the district court's approval of the special master's allocation of assets between the Separate Fund and the General Fund. Section 60(e) provides in relevant part:

(2) All property at any time received, acquired, or held by a stockbroker from or for the account of customers, except cash customers who are able to identify specifically their property in the manner prescribed in paragraph

(4) of this subdivision and the proceeds of all customers' property rightfully transferred or unlawfully converted by the stockbroker, shall constitute a single and separate fund; and all customers except such cash customers shall constitute a single and separate class of creditors, entitled to share ratably in such fund on the basis of their respective net equities as of the date of bankruptcy: *Provided, however,* . . . If such fund shall not be sufficient to pay in full the claims of such class of creditors, such creditors shall be entitled, to the extent only of the respective unpaid balances, to share in the general estate with the general creditors.

■ First, the escrow claimants contest the procedure the receiver followed in determining that certain cash should be allocated to the Separate Fund. This procedure focused on the outstanding checks of First Securities that were dishonored by the firm's bank when the receivership was instituted. To the extent these checks represented an amount due a customer, the receiver included them in the Separate Fund. The escrow claimants argue that this procedure is improper because it concentrates on the disposition of funds rather than on their source.

Escrow claimants are correct in identifying the critical question: How much of the cash on hand, commingled in one bank account, was "property . . . held . . . for the account of customers"? The fact that the receiver began by looking at the checks outstanding at the beginning of the receivership does not, however, mean that his method was inappropriate for deciding the critical question or that it resulted in clearly erroneous findings.

By comparing these checks with other records, the receiver determined which checks were given in settlement for sales of customers' stock previously turned over by customers for sale and which were given in payment for securities ordered by customers and paid for in advance. The records used to arrive at

this determination included confirmation slips mailed to customers, transfer orders requesting mutual funds to issue shares, and customer account ledgers.

Funds represented by checks that could not be traced to property received or held for a customer were excluded from the Separate Fund. We are convinced that the procedure chosen by the receiver was reasonable, and with one exception, the findings based thereon were not clearly erroneous.

■ We conclude that the receiver erred in allocating to the Separate Fund $51,894.77 involved in a transaction with Continental Illinois National Bank and Trust Company of Chicago.

The underlying transactions took place as follows:

On June 4, 1968, Continental Illinois placed an order with First Securities for the sale of 580 General Electric shares. On June 10, Continental Illinois delivered the stock certificates. On June 11, the day after filing of the complaint herein, but before any action by the court, Continental Illinois debited the bank account of First Securities in the amount of $51,894.77, the gross sales price less charges. A restraining order was entered June 12, and the receiver was appointed June 17.

Later, pursuant to order of the district court entered August 2, the receiver returned the certificates to Continental Illinois in exchange for the same sum of money. We think that whether the second exchange of stock for money be deemed rescission of the first as if no transaction occurred, or a second sale, the asset represented by the stock or the proceeds was held by First Securities from June 11 on, for its own account and not for the account of a customer. Accordingly, $51,894.77 was erroneously allocated to the Separate Fund.

■ The escrow claimants also argue that certain transfers from stockbrokers should not have been included in the Separate Fund. These transfers were profits First Securities fortuitously obtained on purchases and sales of stock that were made as a result of the receivership. When the receivership was instituted, certain securities transactions were in process, but due to the receivership they were held in abeyance. When the transactions were later completed, First Securities registered a net profit as a result of market fluctuations. Since First Securities held no securities on its own account, the securities involved in these transactions must have been owned by its customers. We think, therefore, that the receiver was correct in allocating these profits to the Separate Fund because they represented proceeds of property initially held for the account of customers.

■ Another item challenged by the escrow claimants is $1,775 in dividends the receiver allocated to the Separate Fund. These dividends had accrued on securities that First Securities was unable to deliver due to intervention of the receivership. Since the dividends were earned on stock entrusted to First Securities by customers, we think this sum was also appropriately included in the Separate Fund.

■ Finally, the escrow claimants contest the allocation to the Separate Fund of interest that the receiver earned on United States Treasury Bills. The receiver invested the entire estate of First Securities in Treasury Bills and allocated the interest earned on the investment between the Separate Fund and the General Fund according to the proportions the respective funds bear to the entire estate. The escrow claimants argue that since the statute did not provide for the allocation, it cannot be made. We think, however, that the receiver's allocation comports with the demands of equity.

## IV

The amount of the escrow claimants' claims against First Securities is the subject of the appeal in No. 73–2027. Over the years of the fraud, Nay ostensibly paid the escrow participants interest on their contributions to the escrow.

Nay had indicated that loans would be made by a small loan company at up to 2½ percent interest per month and that consequently investors in the escrow account would receive a rate of between 9 and 12 percent return on their investmant per year. *Hochfelder* appeal, 463 F.2d at 984. The special master recommended that the interest payments received by the escrow claimants be deducted from their claims against First Securities because the payments were usurious. The district court rejected this recommendation, and the Customer Creditors Committee appealed.

The argument that the interest payments were usurious proceeds as follows: the escrow claimants, rather than investing with Nay, loaned their money to him; they received between 9 and 12 percent interest per year on their loans; the maximum rate of interest legally chargeable during the period of the fraud was 7 percent per year, Ill.Rev. Stat. ch. 74 § 4 (1967); and, therefore, the interest received was usurious.[5]

The view of the facts taken by the district court was as follows:

".  .  . Nay induced the Escrow Claimants to invest, representing that their moneys would be used by a small corporation as principal to make loans, making it possible for the investors to realize a high rate of interest. Nay was to act as a conduit for the transfer of funds to the finance company. The interest was to be paid by that company, not Nay, .  .  . Nay received the moneys of the Escrow Claimants for the stated purpose of investing so as to receive a high yield return, not to evade the usury laws. This was a purported investment with the necessary risks of investment, that is, loss of the principal sum."

■ As indicated by the district court, whether, under Illinois law, an advance of money is a loan so that the amount of interest thereon is subject to the statute on usury, or is an investment in a venture, with the hazard of loss, so that the rate of return is not subject to the statute, depends upon the intention of the parties. Stevenson v. Unkefer, 14 Ill. 103, 104 (1852); Clemens v. Crane, 234 Ill. 215, 238, 84 N.E. 884 (1908). Curtis v. LeMoyne, 248 Ill.App. 99, 103 (1928).

■ We deem the finding of the district court as to the character of these transactions not clearly erroneous.

■ The Customer Creditors Committee assert yet another ground for reducing the amount of the escrow claims. They argue that the interest payments represented a return of capital, not interest, and that therefore the escrow participants' claims against First Securities should be reduced to the extent that Nay returned their principal investment. This argument proceeds from the assumption that Nay was running a "Ponzi" swindle[6] in which each time an "interest payment" became due, Nay would withdraw funds from the escrow account's principal to make the payment while enticing investors to contribute additional funds to the account to guarantee a source of funds for future interest payments. As far as the record shows, this is only an assumption. Moreover, in their dealings with Nay and in their tax returns the escrow claimants treated the payments as interest, and we see no reason to favor other general creditors in this proceeding by offsetting the payments as *pro tanto* repayment.

Insofar as the judgment appealed from reflects the allocation of $51,894.77 received from Continental Illinois and the interest earned thereon to the Separate Fund, the judgment is reversed and the cause remanded for adjustments consistent with this opinion. In all other respects the judgment is affirmed. No costs on appeal to any party.

---

5. The Customer Creditors Committee concedes that the payments were not usurious; but the argument is renewed on appeal in the receiver's amicus brief.

6. Cunningham v. Brown, 265 U.S. 1, 7–9, 44 S.Ct. 424, 68 L.Ed. 873 (1924).